HILL *et al.*, receivers, *v.* THE WESTERN AND ATLANTIC
    RAILROAD COMPANY; and the same *v.* THE GATE
                CITY NATIONAL BANK.

FALLIGANT, J.*—1. Section 4429 of the code (Act of 1833) is a special
    statute of the State of Georgia with reference to banks, intended
    to prohibit preferences by a bank insolvent at the time or in con-
    templation of insolvency, which preferences might be legal in the
    case of other insolvent debtors under the act of 1818.

(a) In order for the receivers to maintain these suits, it was not nec-
    essary, as a condition precedent, that the president, directors or
    other officers consenting to such fraudulent transfers of effects,
    etc., should first be prosecuted.

2. When an insolvent bank executes an assignment of " all and every
    of its property and effects, rights and credits of each and every
    kind and character whatsoever, in as full and complete a manner
    as the same are now owned, held and possessed by it," and the
    assignees accept the trust, the title of the property passes to the
    assignees, and the right to sue for and recover all rights, credits,
    etc.

3. When, upon the prayer of a creditors' bill, receivers of the court
    are appointed to receive, take and hold all the property and effects
    conveyed to said assignees by said deed of assignment, said re-
    ceivers acquire all the rights of said assignees. If prior to said
    assignment the said bank, being insolvent or in contemplation of
    insolvency, has made any transfer of its effects in violation of sec-
    tion 4429, said transfer is fraudulent and void except as to *bona
    fide* purchasers without notice; and the effects so fraudulently
    transferred become a trust fund in the hands of the transferees,
    which may be recovered by the receivers upon proper action
    brought, it being within the power of a court of equity to au-
    thorize and direct such proceedings.

(a) A depositor or other *bona fide* creditor who draws his check on
    such bank or receives effects therefrom without notice of or
    reason to suspect its insolvent condition, will be considered a *bona
    fide* purchaser under this act.

(b) Under the general term " effects," the transfer of money, prom-
    issory notes or other securities, will be included.

4. The receivers were legally appointed, and, under the order of
    Judge Hood, were fully and properly authorized to institute and
    maintain these suits.

    *Presiding in place of BLECKLEY, C. J., disqualified.

5. Both of these causes are to be tried and controlled under the act of 1833 (Code, §4429). *supra*, and we think there is enough evidence in each case as to the insolvency of the bank and as to notice thereof on the part of the defendants at the time of the alleged transfer of its effects to them, to carry the cases to the jury, to be by them passed upon under the instructions of the court in pursuance of this decision.

The grant of nonsuit in both cases is       *Reversed.*

  December 14, 1890.

Banks. Insolvency. Debtor and creditor. Statutes. Actions. Receivers. Officers. Assignments. Title. *Bona fides.* Trusts. Equity. Before Judge MARSHALL J. CLARKE. Fulton superior court. March term, 1890.

Hill and Thomson, as receivers of the Citizens' Bank of Georgia, brought separate actions against the railroad company for $18,994.76, and the Gate City bank for $17,303.79, alleging as follows: The Citizens' bank, on April 13, 1881, was doing a general banking business, and on and before that day was insolvent. It had numerous stockholders and creditors, two of its creditors being the defendants. On that day, and after its insolvency, it transferred and delivered of its effects to the railroad company $18,994.76, and to the Gate City bank $7,958.79 and three notes amounting to $9,345, these transfers not being for the benefit of all its creditors and stockholders, nor for a valuable consideration, and the defendants knowing at the time of its insolvent condition. On the same day it made an assignment of all its property and effects, rights and credits of every kind and character, to plaintiffs as assignees, for the benefit of all its creditors, and the same was accepted by plaintiffs, and the title to the money and notes above mentioned thereby passed to them, and without authority from them or from the Citizens' bank said money and notes were delivered to defendants. Afterwards a bill was filed against the Citizens' bank and others, and under it plaintiffs were appointed receivers with power and direction to reduce the effects of the bank to their

possession; and afterwards they were directed, by order of the chancellor, to bring suits, as receivers, against the defendants for the recovery of said effects.

The evidence at the trial was as follows: The deed of assignment conveyed to Hill and Thomson, for the benefit of each and all of the bank's creditors, "all and every of its property and effects, rights and credits of each and every kind and character whatsoever, in as full and complete a manner as the same are now owned, held or possessed by it, and as fully as if each and every one was specially named and described herein." It directed that the assignees should convert all of "said effects and property, rights and credits of every kind and character," into cash as soon as the same could be done consistently with its interest, and pay its debts *pro rata* as fast as the same could be done. Thomson and Hill accepted this trust on the same day. The bill under which they were appointed receivers was brought on April 16, 1881, by the Governor of Georgia in behalf of the State against the bank, and against Hill and Thomson as its assignees, alleging that the bank was a State depository; that on the 13th of April it refused to pay a check of the State treasurer, closed its doors, and had made an assignment of all its property to Hill and Thomson; that it was largely indebted to the State, had ceased to do business, and was unable to meet its liabilities; that the assignees had accepted the trust and would take an inventory of the assets with intent to convert them into cash, and, ignoring the right of the State to priority, intended to pay the same to the creditors *pro rata;* and that unless the assignees were restrained from paying any debts due by the bank, until the indebtedness of the State was first paid off and discharged, a great loss would be entailed upon the State. The prayers were for injunction and receiver. On April 25, 1881, Hon. GEORGE HILLYER, judge of the

superior courts of the Atlanta circuit, upon the hear-
ing, ordered that Hill and Thomson be appointed re-
ceivers to "take and hold all the property and effects
conveyed to them by a deed of assignment of the Citi-
zen's Bank of Georgia, . . and that they convert
such property into cash as therein provided, as rapidly
as the same can be done without unnecessary sacrifice
of the assets." The defendants were also enjoined from
paying out any money until the further order of the
court. At chambers in Rome, Ga., on August 27, 1881,
the judge of the superior courts of the Rome circuit
passed an order reciting that Judge HILLYER had held
himself disqualified to act in a collateral proceeding in
the case, and directing that all the orders, judgments
and decrees as above stated, and any others not named
but which had been made by Judge HILLYER, be con-
firmed. Afterwards receiver Thomson presented to
Judge HOOD, of the Pataula circuit, his petition reciting
that the judge of the Atlanta circuit was disqualified,
and therefore Judge HOOD was asked to take jurisdic-
tion "of the matter referred to in this petition." It
stated that petitioner and his co-receiver, Hill, who was
also president of the Gate City National Bank, felt it
their duty to institute suits against various corpora-
tions, among them the Gate City National Bank, for
the recovery of certain sums which it was alleged
these corporations had been paid by the Citizens' bank
on the 13th of April, 1881, which payments the re-
ceivers were informed were void, and the amounts paid
recoverable by them; that Hill, as president, did not
think his bank was liable to refund the amount received
by it, but wished to discharge his duty as receiver and
also his duty as president, and while willing to unite
with the petitioner in bringing a proper suit, it would
be embarrassing to him to unite in this petition, or
to engage actively in the prosecution or management

of such suits as might be brought; and that petitioner desired to employ certain persons to prosecute the suits, as it was embarrassing to him to determine upon the fees. The prayer was, that petitioner be directed as to the terms of the employment of counsel and what fees should be paid them, and the time and manner of payment. On this petition, at chambers, February 28, 1882, Judge Hood ordered that the receivers proceed to institute suits against the corporations named in the petition, for the recovery of any money paid, or assets transferred to them or either of them, by the Citizens' bank or any of its officers, after the insolvency of said bank became known to its officers on the 13th of April, 1881. The remainder of the order provided for the employment of counsel and payment of their fees. At the time this petition and the order thereon were presented to Judge Hood to be signed, neither the original bill nor any of the pleadings in that case were shown to him, nor did he see any record or any orders, or anything of that kind; but a statement was made to him by counsel as representatives of the receiver. No notice was given to anybody about the application for the order. The Citizens' bank was insolvent on April 13, 1881, when the assignment was made. About half past eight o'clock in the morning of that day, the cashier sent a telegram to a bank in Savannah, directing it to pay to another bank there whatever credit balance the Citizens' bank had with it, for the credit of the Gate City National Bank. This telegram was probably received by the bank to which it was addressed, at about half past ten o'clock A. M., and by authority of it there was paid over to the credit of the Gate City bank during bank hours on that day, $7,958.79. The Citizens' bank opened its doors that morning at nine o'clock, and the deed of assignment was drawn and signed between that time and eleven o'clock. The

cashier of the Citizens' bank had no interview with Hill or any officer of the Gate City bank, as to the funds in Savannah, previous to the sending of this telegram, nor was there any understanding as to its transfer. The sending of the telegram was suggested to the cashier by the fact that the Citizens' bank owed the money, and he wanted to pay it and knew no other way to do so. About nine o'clock, the cashier left a message with the cashier of the Gate City bank, asking Hill to come to the office of the attorney of the Citizens' bank. He did not remember that he told the cashier of the Gate City what he wanted with Hill. He was informed that Hill was not then in town but would be in on an early train. At about half past nine, Hill came to the office of the attorney and there met the cashier of the Citizens' bank, and the attorney was then drawing the deed of assignment. The cashier had three solvent promissory notes amounting to about $9,000, the property of the Citizens' bank, from which he had got them that morning. When Hill came in, he handed him the notes, and thinks he then told him about the transfer of the money in Savannah. He also told him that the Citizens' bank was compelled to suspend, and that he wanted him to take these notes as part payment of the amount due to his bank by the Citizens' bank, and wanted him to act as one of the assignees. Hill received the notes and carried them off. Previously on the same morning, the cashier, who was one of the directors of the bank, had seen its president and the assistant cashier (also one of its directors), and one other director, and it was understood between them that an assignment must be made. The cashier did not remember that he had given any information to any of the directors that he was going to send the telegram, but may have spoken to the president and assistant cashier about it. After the assignment was

prepared, the directors named above, the president and two other directors met and directed its execution. Hill afterwards stated that he had received the money transferred to his bank. At the time the assignment was made, the cashier did not believe the bank was insolvent. It had assets sufficient, at their then value, to pay its debts, in his opinion. He did not know that Hill had any knowledge as to its insolvency. Up to the very morning on which the assignment was made Hill had given it credit for considerable sums of money, frequently without security, and, so far as the cashier knew, had absolute faith in its solvency. The question of the solvency of the bank was not discussed when these notes were transferred. The transfer was made before any of the papers connected with the assignment were completed, and, according to the recollection of the cashier, he told Hill nothing about the proposed assignment until he had delivered the notes to him and had told him about the money being sent, though he was not positive as to the order of time in which these events occurred; they were all about the same time and at the same place. He did not intend to pay to Hill anything more than the indebtedness of the Citizens' bank to the Gate City bank, but upon this trial did not remember what the exact amount of that indebtedness was, and did not remember what he did at that time to ascertain the exact amount of the debt. There was no further consideration for the transfer except the debt to the Gate City bank. Part of the indebtedness was New York exchange which had been bought from the Citizens' bank; and the cashier did not know that it had been determined at the time of the transfer whether the New York exchange would be paid or not, but he did not believe it would be paid because other checks had been refused the day before. He did not remember whether at the time of the transfer there was any

settlement of the debt—adjusting and ascertaining the balances, or not, nor did he think he got a receipt from Hill. Nearly all of the indebtedness of the bank to its creditors remains unpaid. On a large amount of assets which the bank had at the time of the assignment, and which were supposed to be of value, there was great loss after the assignment, for various reasons, by no fault of any of its officers.

In the case of the railroad company the following additional evidence appeared : The bank ceased to do business on April 13, 1881, and closed its doors between ten and eleven o'clock on that day. During that morning the teller was in the bank, paying out money part of the time, up to the hour named. Deposits were not received on that day, but about all the money in the bank was paid out. The railroad company kept an account with the bank, and its treasurer was one Morrill, who was also a director of the bank at that time and had been so connected with it for several years, and for a time as president or vice-president. He resided in Atlanta, where the bank was located, and was there on the day of the bank's failure. The teller was a director of the bank, and so was the cashier. On the 11th day of April, Morrill was told by the cashier that the bank was being hard pressed by its creditors, by the State particularly, it being a State depository, and that he was afraid it would have to close. Morrill replied that he did not think so, that the cashier was more frightened than hurt; or something like that. In the afternoon of the 12th of April, Morrill came by the bank and asked the cashier how he was getting along; and the cashier replied that they were still alive, or something like that. On the morning of the 13th of April, between eight and half past eight o'clock, the cashier came by Morrill's house, and told him the bank would have to suspend that day. They talked the matter over, and

agreed to go to an attorney's office and have him draw
a deed of assignment. They did so, and the attorney
began to prepare the deed, the cashier staying until he
had completed it ; Morrill not staying so long, but go-
ing away to his office, as the cashier presumed, at the
defendant's depot, from which office he was called to
come to the bank to a meeting of the board of directors
for the purpose of making an assignment; and the assign-
ment was made. Morrill and the cashier got to the at-
torney's office about half past eight, or a little later, in the
morning, and nine o'clock was the opening hour of the
bank. Morrill was told by the cashier, on the 11th of
April, that the bank was very hard up and a good deal of
money was being taken away from it, partly by the
State; and that if its creditors continued to press it as
they were doing, he did not see how it could weather
the storm. Morrill told the cashier that the next day,
the 12th, was the pay-day of the defendant, but that he
would not take the money that day; and he did not.
On the morning of the 13th, at the attorney's office,
Morrill asked the cashier how much money the bank
had that morning, and the cashier told him as near as
he knew, and Morrill said he would go and have a check
drawn and get the money for his pay-roll. One Watson
was the clerk of Morrill at that time. A little after
nine o'clock on the morning of the 13th, Watson came
into the bank with a check for $22,000 or $24,000,
signed by himself for the treasurer of defendant, and
was told that there was not enough currency in the
bank to pay it. Then $18,624.28 was counted out to
him by the teller, and a check for that amount signed
by Watson for the treasurer and drawn on the bank
was substituted for the other check. The teller testified
that he did not remember exactly how he got the figures
in the amount paid to Watson, but that Watson's pay-
roll perhaps called for an odd amount in change; he did

not remember whether there was the same amount of change called for in the check first drawn, but Watson made out the latter check simply because the teller did not have the $24,000 to give him. He did not remember what he told Watson about the amount of money on hand; he found out how much money there was by looking into the safe where the bills and currency were kept, and counted out about the amount of money mentioned and gave it to Watson ; he is satisfied this did not take every dollar in the bank, but thinks there was $800 or $1,000 paid out on checks after that. In addition to the amount thus paid, the bank owed the defendant, at the time of the failure, $18,887.10, and possibly some additional amounts. Watson came for the money for the pay-roll in the regular manner, and that was the regular pay-roll day. At the time the bank was closed the State was its creditor as a depositor, in the sum of over $100,000, and it had divers other creditors. The teller and cashier both testified that when the bank made its assignment, they did not believe it was insolvent. The cashier testified that he was talking to Morrill, in the conversations above mentioned, as one bank officer to another, with reference to looking out for the bank's interest. The defendant had kept an account with the bank all the time after its organization. It was generally the custom of Watson to send a memorandum early in the day to the bank as to the amount and various denominations of money wanted, so as to give the bank notice. It takes a long time to make up a pay-roll of defendant. It further appeared, that at the time of its failure the bank had over $100,000 worth of certain bonds, and about two weeks or perhaps a month before the failure, $30,000 of them were turned over to the defendant as security for its deposit in case it became necessary to use it as such, some question having been raised by some of defendant's directors about

Morrill keeping the deposit with the bank, it having happened that some time before the failure of the bank one of its drafts had gone to protest in New York on account of a railroad washout. The bonds referred to the bank never got back, so far as the cashier knew, and they were not charged upon the account of the defendant by the bank. After the receivers were appointed, they told the cashier that they were about to sell the bonds, or had sold them, at about 30 cents on the dollar. The bonds, at the time they were transferred to Morrill, were considered by the cashier fairly worth par. It does not definitely appear from the evidence whether the bonds which came into the possession of the receivers, were the $30,000 worth referred to above, or other bonds of the same issue, which were the property of the bank. The $30,000 worth of bonds mentioned did not enter into the amount ($18,887.10) stated above as being still due by the bank to the defendant, on deposit account, after the failure.

A motion for nonsuit in each case was sustained, and the plaintiffs excepted.

CLIFFORD ANDERSON, attorney-general, J. L. HOPKINS, M. A. CANDLER and HALL & HAMMOND for plaintiffs.

JULIUS L. BROWN, N. J. HAMMOND and JACKSON & JACKSON, for defendants.