CLARKE, trustee, *et al. v.* INGRAM *et al.*

1. A conveyance by an insolvent bank, not made for the benefit of all its creditors and stockholders, to one who, at the time of receiving the instrument, either had actual knowledge of the bank's condition or was chargeable with notice of its insolvency, is, under section 1979 of the Civil Code, void.
2. The evidence in the present case demanded a finding against the validity of the trust deed relied on by the plaintiffs in error in the main bill of exceptions.

Argued February 17, — Decided August 2, 1899.

Exceptions to auditor's report. Before Judge Spence. Sumter superior court. May term, 1898.

*Bacon, Miller & Brunson, W. F. Clarke* and *W. M. Hawkes,* for plaintiffs in error.

*J. B. Hudson, E. A. Hawkins, Clarke & Hooper, Guerry & Son, Guerry & Hall, J. E. D. Shipp, R. L. Maynard, W. P. Wallis, J. F. Watson, A. Fort, J. B. Pillsbury, J. Dodson & Son* and *J. A. Ansley,* contra.

LUMPKIN, P. J.    During the fall of 1892, the Bank of Americus became financially embarrassed.    At the close of the year it was heavily involved, and its condition continued to grow worse until finally, on January 20, 1893, at a meeting of its board of directors, "it was deemed advisable to close the doors of the bank," and accordingly a resolution was passed directing that its operations be immediately suspended.    On the same day, Cooper, Gatewood & Co. and other creditors filed in the superior court of Sumter county an equitable petition, in behalf of themselves and all creditors who might subsequently intervene, alleging that the bank was insolvent, and praying that its affairs be placed in the hands of a receiver.    At the interlocutory hearing had upon this petition, the court passed an order appointing a temporary receiver, who at once took possession of all the assets of the bank.    Among its largest creditors were the Southern National Bank of New York, the Tremont National Bank of Boston, and the Louisville Banking Company. In the interest of these three institutions, W. W. Flannagan, the president of the first, went to Americus for the purpose of making an investigation and ascertaining the precise condition of the defendant bank.    After going over its affairs with the assistance of a committee composed of three of its directors, the conclusion was reached that if the bank was furnished with funds sufficient to meet the more urgent demands upon it, and indulgence was granted by the creditors whom he represented, it might be able to successfully resume business and eventually discharge in full all its liabilities.    On his return north, Flannagan made to his principals a report to this effect; and after various negotiations between them and the directors of the Americus bank, a plan looking to its reopening was adopted, the details of which were substantially as follows: The New York bank volunteered to make a loan of $30,000, of which $20,000 was to be advanced in cash and the remainder credited to the Americus bank as a "standing balance" not subject to be drawn against.    The Boston bank and the Louisville bank each agreed to make a similar loan of $15,000, of which $5,000 in each case was to be retained as a "standing balance" subject to a like condition.    In consideration of these advances,

the Americus bank agreed on its part, as security therefor, to deliver $60,000 in notes signed by its directors and by it indorsed, and to execute a conveyance to Flannagan as trustee, covering the greater part of its available assets, the proceeds of which were to be applied to the extinguishment of its indebtedness to the three banks coming to its assistance. Prior to the conclusion of the negotiations just mentioned, each of these three banks had intervened and become a party plaintiff to the pending litigation. Desiring to carry into effect the arrangement above set forth, they joined with the Americus bank in making application to the court for authority so to do, and asked that the temporary receiver be discharged. An order was thereupon passed reciting that, it being represented to the court that the Bank of Americus would thus "be enabled to resume business and in the course of time meet and discharge all its liabilities," and all parties then before the court expressly consenting in writing, the terms of the restraining order previously granted were accordingly modified to the extent of allowing the directors of that bank "to pass such resolutions and to execute such conveyances, assignments and transfers as [might] be found necessary to perfect such arrangement above described." This order further provided that, "upon the performance and completion of all the acts necessary to said adjustment to the satisfaction of" the receiver, "said restraining order be wholly dissolved and annulled," and he be thereupon authorized to turn over to the bank, or to such person or persons as it might designate, all of its assets which had come into his hands. The petition filed by Cooper, Gatewood & Co. was not, however, dismissed; but on the contrary, the order expressly declared that the same should "remain of file and duly pending in said court, and that it so remain until the further order of the court, not to be disposed of or dismissed except by order of the court duly granted upon and after notice to all parties at interest."

Agreeably to the terms of this order, all necessary steps were promptly taken to put into operation the arrangement agreed upon, including the execution of a deed of trust conveying to Flannagan the major part of the assets of the Americus bank.

This instrument clothed him with power to convert into cash, for the use and benefit of the three banks therein named as beneficiaries, all the property thereby conveyed; and provided that the proceeds thus realized were "to be by him, as such trustee, paid over to them pro rata according to the amounts advanced by each of said banks, respectively, to said Bank of Americus, as above recited, and to be by said three banks applied to the payment of any indebtedness due by the Bank of Americus as principal or as endorser to them, respectively." The funds they had agreed to advance were duly paid over to the Americus bank, and it resumed business in the early part of April. The attempt to thus establish it upon a sound financial footing proved, however, entirely unsuccessful, for in less than a month it was forced to again suspend payment and permanently close its doors. Being hopelessly insolvent, no further attempt was made to reopen it; and on July 8, at the instance of certain creditors who had not consented to the above-mentioned order, but who had intervened and been made parties to the equitable petition after that order had been granted, the court appointed a permanent receiver to take charge of and administer the bank's assets. Subsequently, J. B. Ingram and others intervened and prayed, among other things, that the trust deed to Flannagan be declared null and void, it being alleged that this conveyance was executed after the bank became insolvent, which fact was known to the beneficiaries named therein, who fraudulently procured it to be made with a view to thus securing to themselves an inequitable and unlawful advantage over other creditors. In reply to this attack upon the validity of the conveyance in question, each of the three banks concerned filed a separate answer in which the defense was set up, that the deed was executed under the sanction of the court and in entire good faith, neither they nor the directors of the Americus bank knowing or suspecting it was at the time insolvent, and their sole purpose being to assist the bank in tiding over what was then supposed to be a merely temporary embarrassment, so that all creditors would be alike benefited, etc., etc. A similar answer was filed by W. F. Clarke, who had succeeded Flannagan in the office of trustee.

The case was eventually referred to an auditor, who, in passing upon the issue thus presented, in effect found that although the Americus bank was, as matter of fact, insolvent at the time it executed this trust deed, the conveyance was nevertheless binding upon all creditors alike, no evidence of fraud being introduced and it not appearing that the parties therein named as beneficiaries knew of the bank's insolvency until long thereafter. Being dissatisfied with this finding, Ingram, and the other creditors who had sought to have the deed declared void as to them, filed numerous exceptions, both of law and of fact, to the auditor's report in this connection. The trial judge sustained a number of these exceptions; and upon a submission to a jury of the controlling questions of fact involved, a verdict was returned in favor of the excepting creditors. Thereupon Clarke, as trustee, joined with his cestuis que trust in making a motion for a new trial, the overruling of which they here assign as error. By a cross-bill of exceptions, Ingram and others present the complaint that the trial judge erred in disallowing certain additional exceptions filed by them to the auditor's finding that the deed of trust was legal and binding upon all parties to the case.

1. Section 1979 of the Civil Code (Code of 1882, § 4429) expressly provides that: "All conveyances, assignments, transfers of stocks, or other contracts made by a bank in contemplation of insolvency, or after insolvency, except for the benefit of all creditors and stockholders, shall be fraudulent and void, unless made to an innocent purchaser for value without notice or knowledge of the condition of the bank." The controversy presented by the record now before us calls for a construction and application of the law embraced in the words just quoted. To our minds the language used is free from obscurity. It evidently contemplates that all transactions of the character therein indicated shall be deemed invalid, and a legal fraud upon creditors, save where the party contracting with the bank can justly assert a superior equity by reason of the fact that he has in good faith parted with his money under circumstances which place him in the attitude of "an innocent purchaser for value and without notice." As will have

been seen, this section of our code explicitly declares that he
can not claim to occupy that situation if, at the time the con-
tract was made, he had either "notice or knowledge of the con-
dition of the bank." Nevertheless it is in effect contended by
counsel for the plaintiffs in error, that a conveyance made by
an insolvent bank is not to be considered void unless the per-
son for whose benefit it was executed actually knew of the
bank's financial condition, and, accordingly, that he would be
entitled to claim the protection accorded to a bona fide pur-
chaser if he honestly believed the bank was not insolvent, but
temporarily embarrassed only, and in good faith advanced his
money with a view to relieving its supposed momentary dis-
tress and placing it upon a sound financial footing. That is
to say, counsel seem to insist that actual *knowledge* is necessary,.
despite the provision of our statute that a person dealing with
an insolvent bank can not occupy the position of a bona fide
purchaser unless he be not only without knowledge, but also
without *notice* of the bank's condition. Looking to the evident.
purpose of this statute to afford protection to all persons justly
entitled thereto, we have no doubt that it contemplates actual,
rather than merely constructive, notice. But it by no means.
follows, as is insisted, that a person sought to be charged with
such notice must be shown to have had actual knowledge that
the bank with which he was dealing was insolvent. The terms.
"knowledge" and "notice" are not synonymous or interchange-
able, and should not, therefore, be confounded the one with
the other. That which clearly does not amount to positive
knowledge may often, in a legal sense, constitute actual notice.
Accordingly, in applying a statute which contemplates that.
only actual notice shall affect the rights of one acting in good
faith, the language used expressly or by necessary implication:
negativing the idea that he is chargeable with constructive·
notice as well, the mere fact that he did not have precise and
definite knowledge concerning the matter in question can not
be regarded as having any real importance whatever. On the
contrary, the distinction to be drawn in a case calling for the
application of such a statute is that "between actual and con-
structive *notice*, and not between actual *knowledge* and con-

structive notice. The difference in meaning between *knowledge* and *notice* must not be overlooked, for it is equally important with the distinction between the different kinds of notice. The fact to be established, when the case requires proof of actual notice, is that the party acquired his pretended rights with notice, and this may be true although the purchase may have been made in actual ignorance of the facts of which knowledge is imputed to the purchaser." Wade on Notice (2d ed.), § 36a.

"Notice is actual when one either has knowledge of a fact or is conscious of having the means of knowledge, although he may not use them. Actual notice may be divided into express and implied. Express notice embraces not only what may fairly be called knowledge, from the fact that it is derived from the highest evidence to be communicated by the human senses, but also that which is communicated by direct and positive information, either written or oral, from persons who are personally cognizant of the fact communicated. The implication of notice arises when the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact." 16 Am. & Eng. Enc. L. 790. To the same effect, see Wade on Notice, §§ 5–8; also, § 11, as follows: "It is easy to understand how one may be concluded from denying actual notice when positive information has been traced directly to him. It is not necessary to invoke the doctrine of constructive notice in order to justify holding that he will not be heard to deny that he understood the import of what was clearly and plainly communicated. Whether the notice has been communicated can not be determined by the standard of the recipient's stupidity or heedlessness. For the reason, therefore, that ignorance of an important fact which has been placed within the easy reach of a party imports either fraud or gross negligence on his part, the law will never inquire further than is necessary to show the giving of the notice by such means as are sufficient to convey intelligence from one human being to another. It has accordingly been held that, 'When a party, having knowledge of such facts as would lead any honest man, using ordinary caution, to make further in-

quiries, does not make, but, on the contrary, studiously avoids, making, such obvious inquiries, he must be taken to have notice of these facts which, if he had used such ordinary diligence, he would readily have ascertained,'" citing Whitbread *v.* Jordan, 1 You. & Coll. Exch. 303, and numerous other cases in point. It is clear, therefore, that in no case should the investigation be confined to an inquiry into the actual knowledge of the person sought to be charged with notice, the really important question to be determined in each instance being, not what he actually knew, but what under the circumstances he *ought* to have known. Passive good faith will not serve to excuse ignorance which is unpardonable. Accordingly, a legal fraud upon the rights of innocent third persons can not be justified by even the very best of intentions. If express notice of the main fact itself be brought home to one before he acts to his prejudice, he can not ignore the warning. He may honestly believe that the notice given him, although it comes apparently from a reliable source, is not in accord with the truth; yet, in venturing to disregard the same, he acts at his peril. If the notice given him be legally sufficient, it matters not what excuse he has to offer for his failure to govern himself accordingly. Nor is it always necessary that it be shown that he received due notice of the particular facts in ignorance of which he claims to have acted, if the circumstances were such that, by the exercise of reasonable diligence, he might have acquired knowledge thereof by pursuing the inquiry which would have suggested itself to an ordinarily cautious and prudent man. Indeed, the doctrine of implied notice is far-reaching in its operation. For instance, it has been held that: "Knowledge of the insolvency of a trustee from whom a conveyance is received in satisfaction of the personal indebtedness of such trustee would be sufficient to put the purchaser upon inquiry as to the bona fides of the transaction, and in equity he would be considered as having notice." Wade on Notice, § 22, citing Pendleton *v.* Fay, 2 Paige, 202, and Stroughill *v.* Anstey, 1 De G., M. & G. 635.

Little difficulty is encountered in applying these rules to the ordinary case. It frequently occurs, however, that persons

transact their business dealings through agents.   Especially is this true, and necessarily so, of corporations.   The question has therefore sometimes arisen, whether or not a person claiming to occupy the position of a bona fide purchaser is chargeable with notice given to his agent.   " Generally, when the doctrine of notice to agents is referred to in the books, it is mentioned as constructive notice.   But it seems to be governed to a considerable extent by the rules applicable to actual notice.   .

.   To hold that purchasers could never be affected with actual notice, through an agent or attorney, would be to afford extraordinary facilities to those who wished to take advantage of the statutes requiring actual notice of the equitable interests" of third persons; for if such agent or attorney "should be conveniently blind to whatever promised to disclose" notice thereof, " or conveniently dumb in regard to such disclosures when made, his principal might be effectually shielded from the consequences of the fraud perpetrated by his representative.   It may not be strictly logical to say that 'notice to an agent is *actual* notice to the principal.'   But in the event of this question arising under such a statute, it will probably be held a fraud upon the owner of the equity   .   .   for the agent to conceal the knowledge acquired in the course of his principal's employment, and the principal will not be permitted to profit by his agent's fraudulent act.   .   .   It may therefore be confidently stated, that while notice to an agent is only regarded as the legal equivalent of personal notice to the principal represented in the transaction in which the agent is engaged, because of the legal presumption, which is conclusive upon the principal, that the agent, in pursuance of his duty, will convey the information to his principal, still, notice to the agent is more than constructive notice to the principal.   Even where actual notice is, by statute, alone sufficient to affect purchasers, the fact that actual notice is brought home to the one who represents such principal in the transaction would be as binding upon him as though he had been personally notified.   And if the notice comes to the agent in the shape of knowledge of circumstances which should put a man of ordinary prudence upon inquiry, the principal will, by implication, be charged with notice as

though he had been personally cognizant of the facts which challenged inquiry from the agent." Wade on Notice, §§ 31–33, citing Bank of United States v. Davis, 2 Hill, 451 ; Kennedy v. Green, 3 M. & K. 699; Greenfield v. Edwards, 2 De G., J. & S. 582. Certainly this is true so far as the statute now under consideration is concerned, for it does not undertake to provide that such notice only as can technically be termed "actual" shall be binding upon persons dealing with an insolvent bank, but broadly declares that no one is to be considered an innocent purchaser unless he was "without notice or knowledge of the condition of the bank." It is a well-settled rule of law that a principal can not in part ratify and in part repudiate what is done in his behalf by an agent. When, therefore, in order that a principal may profit by a contract made for his benefit, it is necessary that he should elect to adopt as his own the acts of an agent through whom the contract was effected, it is eminently fair and just that the rights of the former in the premises should be made to depend upon the inquiry whether, were the agent seeking to enforce the contract for his own benefit, he could be met with the defense that he was not a bona fide purchaser without notice. Surely, where a statute expressly declares that a contract made under certain circumstances shall be invalid, because amounting to a legal fraud upon persons not parties thereto, it matters not by whom the contract was effected, whether by the principal himself or by his agent; for, the same being totally unauthorized by and repugnant to law, it can not be considered legal and binding simply because an enforcement thereof is sought by one who is not morally responsible for the fraud thus committed upon the rights of equally innocent third persons. On the contrary, such person, having put it within the power of his agent to commit this wrong as to them, must suffer rather than they.

2. Before undertaking to apply to the case in hand the principles of law above announced, it is proper to again call attention to the fact that at the time the court below passed the consent order by virtue of which the Americus bank executed and delivered to Flannagan, as trustee, the conveyance which certain of its creditors seek to have canceled, not one

of the latter was a party to the case; and accordingly, none of them can properly be considered bound by that order. The only course open to these creditors whereby they could enforce their rights was to intervene in the still pending suit, they not being at liberty to institute and maintain in their own behalf an independent proceeding. Civil Code, § 4903. A creditor may intervene in such a case "at any time before the final distribution of the assets" in the hands of the court, the only restriction placed upon an exercise of this right being that he shall thereby become "chargeable with his proportion of the expenses of the previous proceedings" therein. Ibid. § 2718. It is fair to add, in this connection, that we do not understand counsel for the plaintiffs in error to insist that those of the bank's creditors who became parties to the litigation after the consent order above referred to was passed were not at liberty to assert that the trust deed made by the bank agreeably thereto was void and inoperative as to them. Indeed, an examination of the record before us discloses that the only issue presented and passed upon in the court below was whether or not, independently of this consent order, the parties for whose benefit the conveyance was executed could legally be regarded as bona fide purchasers. Their counsel insisted at the trial, and now insist, that they occupy the position of innocent purchasers for value and without notice, and contend that there was no evidence to warrant a finding that they knew or even suspected that the bank with which they were dealing was insolvent, or that they had any fraudulent purpose to gain an unconscionable advantage over other creditors. Or, in the precise language used in the brief filed in support of this contention: "This is a case sui generis. It is an effort on the part of three creditors to afford the debtor the means with which to pay all his creditors. It is not undertaken with a view to the payment of the creditor who has advanced the money, but with the view of the debtor paying all his debts. To enable him to do this the creditor advances $60,000, with which the debtor says that he will be able to resume business and pay off all pressing obligations and put him on a solid foundation for the future. This being true, it was not a con-

veyance in view of insolvency, nor a conveyance after insolvency, but rather an effort to prevent insolvency." And as an argument going to show good faith and want of notice of the bank's condition, counsel further contend that "the plaintiffs in error would never have advanced to the Bank of Americus $60,000 unless they had believed that this loan of $60,000 would enable the Bank of Americus to overcome its difficulties and resume a successful business." It appears that the jury utterly repudiated the theory so ably advanced by counsel, that the three foreign banks came to the support of the fallen bank merely to the end that it might be relieved of a temporary distress and that they and all other creditors might be alike benefited. After a careful consideration of the undisputed facts disclosed by the record, we can not escape the conclusion that the finding of the jury was exactly what it should have been.

It is a circumstance inviting comment that, whatever may have been the real intention of the plaintiffs in error, the scheme adopted by them for carrying their purpose into effect was calculated to prejudice, rather than to protect, the rights of other creditors. Upon the latter was to fall the whole burden of loss in the event the attempt to re-establish the bank upon a sound financial footing should prove unsuccessful. The three creditors who came to its rescue hesitated long enough to exact certain conditions. They agreed to advance their money only upon the understanding that the bank should convey to Flannagan, as trustee, practically everything it possessed, including the very roof over its head. This deed was to secure, not only the money advanced, but the bank's prior indebtedness to them, and thus gave them a preference over other creditors, none of whom were to have any interest whatever in this conveyance or its fruits. Only in the event the bank should succeed, with the aid of this relatively inconsiderable loan, in regaining its footing, could other creditors possibly hope to derive any benefit from the arrangement. Was it reasonable to suppose that, stripped of its assets in this manner, the bank would succeed in its attempt? In theory only was it advanced $60,000. The "standing balance," it not being in any event

subject to be drawn against, was, as was explained by the attorney who represented the plaintiffs in error in the transaction and who testified as a witness on the trial, a thing of no benefit whatever to the Americus bank. In reality, it was to get but $40,000. This witness testified that he took occasion, in the course of conferences held with the directors of the bank, to call "their attention to the fact that while they were contracting for $60,000, when they agreed that $20,000 should be held as a standing balance" not subject to check, "that they were in fact getting only $40,000;" and when they replied "that with the $40,000 and the amount of cash then in the bank they would be enabled to successfully resume, [he] did not agree with them and so said repeatedly," endeavoring rather "to dissuade the gentlemen from entering into the agreement than to persuade them into it." He further testified: "My reason for thinking that they could not resume on that amount of money was that I knew the amount of their deposit account. I presume that Mr. Flannagan knew; that is what he came down here to do. . . Mr. Flannagan and those gentlemen knew as much about these things as I did. I think that Mr. Flannagan was just as cognizant of the condition of the bank's affairs as I was; probably more so. This is true because he was a banker, and for the further reason that Mr. Flannagan went through these statements with these gentlemen very much more carefully and more thoroughly than I did." Mr. Flannagan, it will be remembered, was the special agent of the plaintiffs in error, who was sent by them to Americus to investigate and report the condition of the bank. They do not undertake to deny that he fully acquainted them with all the information it was possible for him to secure during his visit of several days, aided by the directors and managing officers of that institution. His testimony was not taken by interrogatories, nor was he introduced as a witness. Indeed, no direct evidence whatever was offered by the plaintiffs in error going to show that they were not fully cognizant of the condition of the bank. Results demonstrated the fact that the judgment of their attorney was unerring, for the bank collapsed within a month after reopening its doors, notwithstanding the aid ex-

37

tended to it.    The evidence establishes beyond any question that it was hopelessly insolvent at the time it first suspended business, and that it has so remained ever since.    As to this there was no controversy at the trial, no exception having been taken to the auditor's finding to that effect.

About all that can be said in support of the contention of the plaintiffs in error that they acted in entire good faith and in ignorance of the insolvency of the bank is the purely persuasive argument advanced by counsel, that it is unreasonable to suppose that they would make so large a loan to the bank unless they honestly believed it was only temporarily embarrassed and would be able, if granted indulgence, to successfully resume business on the sums advanced.    While certainly plausible, this argument is not altogether convincing.    Upon the idea that the trust deed executed by the bank could be upheld in the event it was not shown they had actual knowledge of the bank's insolvency—which is the sole ground upon which they stand,—they might well have concluded that they could afford to advance even so large a sum as $40,000, if in return they were to be given a preference over other creditors both as to the loans composing the same and as to the old indebtedness approximating that amount.    Be this as it may, however, we think, as already stated, that a finding against the validity of that conveyance was, under the undisputed facts of the case, absolutely demanded.    Unquestionably the plaintiffs in error knew (1) that the Americus bank was so embarrassed financially that it could not continue business, and accordingly had voluntarily closed its doors; (2) that certain creditors, including one of the bank's directors, had filed an equitable petition alleging its hopeless insolvency and praying that a receiver be appointed to take charge of its assets; (3) that the court, upon an interlocutory hearing of the case, had, presumably upon a legally sufficient showing that the bank was insolvent as alleged, appointed a temporary receiver as prayed for and placed him in charge of its affairs.    Indeed, each of them had formally recognized the propriety of this petition, had adopted as true the allegations of insolvency therein contained, and had formally intervened and asked to be made a party to the litigation.    If

the information thus afforded them did not constitute "express" notice of the main fact itself, to wit, the fact of the bank's insolvent condition, we are at a loss to conceive of any case in which the doctrine of express notice could properly be applied. That they did not avail themselves of this notice is utterly immaterial. Nor can they be heard to deny that they understood the import of what was thus clearly and plainly brought to their attention; for, as has been seen, whether or not express notice has actually "been communicated can not be determined by the standard of the recipient's stupidity or heedlessness." As alleged "ignorance of an important fact which has been placed within the easy reach of a party imports either fraud or gross negligence on his part, the law will never inquire further than is necessary to show the giving of the notice by such means as are sufficient to convey intelligence from one human being to another." Wade on Notice, supra. What has just been said effectually disposes of this case. After express notice is once brought home to a party, we understand the law to be that if he undertakes to then enter upon an investigation on his own account with a view to disproving the correctness of the information thus afforded him, he acts at his peril in forming and acting upon a conclusion at variance therewith, whether his mistake be occasioned because he is unable to ascertain all the various facts and circumstances necessary to be considered, or arises purely by reason of an error in judgment. However, it may not be altogether improper to inquire briefly into the merits of the excuse which the plaintiffs in error offer for their failure to be governed by the warning given them.

It is a somewhat singular circumstance that in this case the parties sought to be charged with notice themselves invite the court to regard as their own acts what was done in their behalf by their special agent, Flannagan, and to test their rights in the premises by what knowledge or notice he had of the insolvency of the bank. Their position, as we understand it, is that although they knew the bank had suspended and was in the hands of a receiver appointed under a creditor's petition alleging its insolvency, they sent Flannagan to Americus to in-

vestigate the true state of its affairs; that he made a careful
and thorough examination concerning its assets and liabilities,
and arrived at the conclusion that it was only temporarily em-
barrassed, which was also the opinion reached by its directors;
and though it subsequently developed that both he and they were
mistaken regarding its true condition, he had taken every pre-
caution which could be expected of a reasonable man in prose-
cuting his inquiries, had acted in entire good faith, and hon-
estly believed the bank was not insolvent.    Thus is afforded
the explanation why his principals are willing that his knowl-
edge should be imputed to them; for it is obvious that unless
unreservedly adopting as their own the action taken by him in
pursuing these inquiries, they would occupy the somewhat
awkward attitude of one who had, without making any effort
whatever to ascertain the truth, totally ignored and disregarded
express notice to himself personally.    The extent and charac-
ter of the investigation made by Flannagan are disclosed by
the testimony of two of the committee of three directors who
assisted him therein, from which the following extracts are
taken: "There was no examination of the actual assets of the
bank.    The information that Flannagan and  .  .  the com-
mittee from the board had was a series of statements made up
by ·[the officers of the bank] as to what were the real assets."
"During this investigation of the bank's affairs, we simply
went through the statements that were turned over to us by the
officers.    I think we advised Flannagan as to the result.    We
met every morning and talked the matter over" with him.    At
the first conference, the committee felt "somewhat despondent
as to the condition of the bank, based on the examination made
up to that point; [but] on the next and subsequent confer-
ences, when fuller reports had been made as to what were the
assets and liabilities, a better general feeling was manifested."
The assets were estimated between $70,000 and $100,000.    "I
do not think there was a great deal of difference" between the
assets and the liabilities, though "the liabilities were some-
thing over the assets—not a great difference.    We discussed
with Flannagan the assets and liabilities.    I think Flanna-
gan's opportunity for ascertaining the condition of the bank

was about that of the directors." "I rather think the liabilities exceeded; I know that was my impression at the time." The cash turned over to the temporary receiver amounted to between $10,000 and $13,000. "I contended all the way along that we must have $60,000 to carry on the bank."

The president of the bank, who attended some of the conferences, testified that "the amount estimated to be necessary by the committee who were conducting the negotiations was $60,-000. This amount was estimated as indispensable. Mr. Flannagan was present when that was insisted upon." All realized that the success of the scheme to reopen the bank depended upon public confidence being restored and the deposit account of the bank being brought up to a normal condition. The attorney representing the plaintiffs in error, and through whom, after Flannagan's departure, "the entire transaction was conducted and concluded," testified further, as to his reason for believing a loan of only $40,000 would not be sufficient to enable the directors to reopen the bank, that: "They owed the State $10,000; they owed the receivers of the S. A. M. Railway $10,000; they owed the City of Americus about $18,000 or $19,000. That was $38,000 that I felt morally certain would be checked out very promptly. The city had intervened, and the city treasurer had made a demand for the money. I knew that the receivers [of the railway company] were going to check out. . . I felt pretty sure that $20,000 would be checked out as soon as they opened."

It is clear that none of the parties were of the opinion that the bank was solvent, in the sense that it was in a position to presently liquidate its entire indebtedness. On the contrary, it was not contemplated that the bank could do so even with a loan of $40,000 or of $60,000; but simply that it might be able to resume business and pay off the more pressing claims upon it, the lenders of the cash advanced, who were its principal creditors, granting indulgence as to its main indebtedness. It afterwards developed that even this scheme should not have been for a moment considered feasible, as in judging of its plausibility the parties acted upon the assumption that the assets of the bank approximated the amount of its liabilities, but

a grave error was made in overestimating the value of the assets of the bank, which included much real estate. In this connection, one of the witnesses above referred to testified: "Times have been such that I can hardly estimate the value of this property. We thought it was worth more than it sold for. It has not come up to our expectations." But even assuming that Flannagan had a right to accept without question or investigation the estimate placed thereon by the officials of the bank; he could not have been misled into the belief that the concern was solvent, even though he may have applied to the term "insolvency" its popular meaning, viz., "the insufficiency of the entire property and assets of an individual to pay his debts." Anderson's Dic. L. 552. On the contrary, the evidence discloses that the conclusion reached by these officials and himself was that the bank's liabilities somewhat exceeded its assets, even upon the liberal basis upon which the value of its property was estimated. In legal contemplation, "Insolvency is the state of a person who from any cause is unable to pay his debts in the ordinary or usual course of trade." 11 Am. & Eng. Enc. L. 168. "The term is used in the latter sense when traders and merchants are said to be insolvent." Anderson's Dic. L., supra. This is now accepted and "approved as a general rule" in regard to persons engaged in trade. 11 Am. & Eng. Enc. L. 172. Obviously, any other criterion would render utterly ineffectual all statutes passed for the benefit of creditors looking to the winding up of the affairs of commercial enterprises the owners of which are unable to further prosecute business. Leaving out of consideration, then, the doctrine of implied notice, it will be seen that Flannagan had express notice of the bank's insolvency, derived from a personal examination into its affairs. No man of even ordinary intelligence would have pronounced the bank solvent, from a legal standpoint, or from the standpoint of common sense. He evidently did not so regard it, but merely reached the conclusion that it might be able to resume business on the proposed loan, if public confidence was restored and the creditors he represented refrained from pressing the large claims held by them. Certainly, he was not "without notice of or reason to suspect its insolvent condition." See *Hill* v. *W. & A. R. R. Co.*, 86 *Ga.* 284.

The foregoing discussion deals with every phase of the case which has suggested itself to us. In arriving at the questions necessary to be considered, we have not been aided further than by the argument of counsel, the motion for a new trial filed in behalf of the plaintiffs in error in a most general way only assigning the alleged errors complained of. Aside from the usual grounds, that the verdict was contrary to law and the evidence, is one alleging that the trial judge erred in approving certain exceptions of law and fact filed by Ingram et al. to the auditor's report (which ruling was also excepted to pendente lite), movants contending "that the court should have disallowed and dismissed all of said exceptions, . . . and should have directed the jury to find in favor of and sustaining the master's report under the evidence in said cause." As all of these grounds go merely to the merits of the controversy as shown by the evidence, we feel that the attempt made above to show that the verdict was correct in any view of the evidence is as far as we can go on the line of specifically dealing with the points thereby raised. Still another ground complains of a refusal to give in charge certain written requests, which, on examination, we find to have been fully covered by the general charge of the court, and which, we may add, are diametrically opposed to the views we have ventured hereinbefore to express. The remaining grounds set forth certain extracts from the charge to which exception is taken, though the motion is entirely silent in the matter of indicating wherein the alleged error consisted. The bill of exceptions assigns as error the overruling of the motion, but does not state with any more distinctness than the motion itself the movants' contention that the court erred in giving the instructions referred to. It is not necessary, however, to pass upon the correctness of these instructions; for, irrespective of any error which the trial judge may have committed in charging the jury as to the issues upon which they were to pass, the verdict should not be set aside, for the imperative reason that it was demanded by the evidence. In any view of it, the charge as a whole was more favorable to the plaintiffs in error than they had any right to expect, as it gave to them the benefit of a theory to which they were not entitled under the undisputed facts disclosed at the trial.

It follows from the disposition we make of the main bill of exceptions that it is immaterial whether the court did, or did not, properly decline to approve the exceptions to the auditor's report filed by the defendants in error in the main bill of exceptions, and which are set forth in their cross-bill; for the upholding of the verdict affords to them all the relief they seek.

*Judgment on main bill of exceptions affirmed.   Cross-bill of exceptions dismissed.   All the Justices concurring.*