HAWES, trustee, *v.* BANK OF ELBERTON.

1. A trustee in bankruptcy may take a case to the Supreme Court of this State in forma pauperis, by filing an affidavit which discloses his inability, as the representative of the bankrupt estate, to pay the costs.

2. Under the express provisions of the bankrupt act of 1898, a transfer of property by an insolvent debtor, which operates as a preference in favor of one of his creditors, is not, though made within four months next preceding the filing of a petition in bankruptcy, voidable at the election of the trustee, unless such creditor, or persons acting in his behalf, "had

reasonable cause to believe that it was intended thereby to give a preference."

(a) In the present case, the plaintiff failed to establish his contention that the creditor alleged to have been given a preference had implied notice of the debtor's insolvency and purpose in making the transfer.

(b) When a creditor in good faith takes collateral security for a debt, at a time when his debtor is solvent and more than a year before a petition in bankruptcy is filed, the creditor is entitled to realize on the security, notwithstanding he may, before undertaking to do so, learn that his debtor has become insolvent.

3. Though error may have been committed in excluding certain evidence offered to show the debtor's insolvency, yet this affords no ground for ordering a new trial, the plaintiff, after being allowed to establish the fact by other evidence, having failed in other respects to prove his case as laid.

4. It is not within the province of a witness to inform the court or jury whether a hypothetical state of facts would or would not, in his opinion as a business man, constitute implied notice to a creditor of his debtor's insolvency.

Submitted December 1,—Decided December 22, 1905.

Petition.    Before Judge Holden.    Elbert superior court.    May 27, 1905.

A petition was filed by A. S. Hawes, as trustee in bankruptcy of J. J. Stephenson, against the Bank of Elberton, to set aside an al-. leged preference in favor of the bank, made by the bankrupt within four months next preceding the filing of the proceedings in bankruptcy. The case made by the petition was substantially as follows: Stephenson had been conducting business as a wholesale grocer in Elberton, Ga. On or about July 15, 1902, he sold out his business to D. C. Smith, J. R. Mattox, and D. H. Arnold, for approximately $12,000, accepting in payment three notes given by the purchasers, one for $4,500, one for $5,000, and the other for $1,461.72, due December 1, 1902. He was at the time indebted to the Bank of Elberton in the sum of $6,000, and transferred to the bank the note for $4,500, receiving a credit for that amount upon his indebtedness to it. Stephenson also had an equity in a house and lot in Elberton, being the holder of a bond for titles from the owner, Mrs. N. E. Hudson; and after disposing of his interest in the premises, he paid to the bank $1,000 of the amount realized therefrom, this payment, as well as that above mentioned, being made within four months prior to the filing of the petition in bankruptcy. When these payments were made, Stephenson was hopelessly insolvent, and they constituted a preference in favor of the bank over other creditors and

enabled the bank to obtain a greater per cent. of its debt than was received by other creditors of the same class. This debt was then in existence, being an antecedent debt of some length of standing, and it was the intention of Stephenson to prefer the bank over his other creditors. The bank knew, had notice of, or had reasonable grounds to suspect, the intention of Stephenson to prefer it, as well as notice of his insolvency; and the preference was made with the intent and purpose on his part to hinder, delay, and defraud his creditors, and such was its practical effect. The bank knew or was chargeable with knowledge of this intention on his part. Plaintiff has no property of the bankrupt estate in his hands out of which to pay the debts against it, and has not received any.

The action was in renewal of one commenced August 25, 1903, in which a judgment of nonsuit was rendered at the March term, 1904, of the court, the petition having been filed within six months from the date of that judgment. On the trial under review, the court, after the close of the plaintiff's evidence, again granted a nonsuit. Exception is taken to the disposition thus made of the case, as well as to various rulings of the court touching the admissibility of evidence which the plaintiff sought to introduce, but which was excluded.

　　*Z. B. Rogers* and *C. D. Maddox,* for plaintiff.

　　*I. C. Van Duzer,* for defendant.

　　EVANS, J. (After stating the facts.) 1. On the call of the case in this court a motion to dismiss the writ of error was made on the grounds, (1) that the Civil Code, §5553, allowing a "plaintiff in error" to carry a case to the Supreme Court in forma pauperis, does not apply to a trustee in bankruptcy, and (2) even were this otherwise, the pauper affidavit filed by the trustee is insufficient, inasmuch as he does not swear that because of *his* poverty he is unable to pay the costs, but merely that the estate he represents is unable to do so, notwithstanding "the contemplation of this section is, that if the *actual* party litigant is able to pay the cost, he must do so." Neither of these positions is well taken. *Barfield* v. *Hartley,* 108 *Ga.* 435, and cit. The pauper affidavit filed in this case is in the correct form, since it discloses that the plaintiff in error, A. S. Hawes, as the "trustee in bankruptcy of J. J. Stephenson, is, because of the poverty of said bankruptcy estate, unable to pay the costs."

2. The petition was framed under chapter 6, § 60 *b*, of the bankrupt act of 1898, which provides that "If a bankrupt shall have given a preference within four months before the filing of" bankruptcy proceedings, "and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person." On the trial the plaintiff did not contend that any of the officials or agents of the bank had any actual knowledge either that Stephenson was insolvent when he transferred to it the note for $4,500, or that he intended thereby to prefer the bank. As a witness in the plaintiff's behalf, Stephenson himself swore he did not at that time know he was insolvent, and that he had no intention whatever to give to the bank a preference. There was, however, testimony from which the jury might have found, not only that Stephenson was in point of fact insolvent, but that he realized his financial condition and sought to protect his brother, who had indorsed notes held by the bank, by discharging this indebtedness to it in part before the crash came. The most the plaintiff sought to establish concerning notice to the bank of the alleged preference was that its officers had reason to suspect that Stephenson had become financially involved, and had reasonable cause to believe that the transfer of the $4,500 note was intended by him to operate as a preference to it over other creditors. They testified, in behalf of the plaintiff, that they did not suspect anything of the sort, and dealt with Stephenson in good faith, in the usual course of business, believing his solvency was beyond question. The plaintiff nevertheless insists that the officials of the bank could and ought to have known of Stephenson's real financial standing and of his motive in transfering the note. The facts relied on as authorizing this conclusion are substantially as follows: At the time of the transfer, in July, 1902, there were outstanding against Stephenson, as shown by the court records, a justice's court execution, issued in February, 1898, for $6.98 principal, besides interest and costs, and another execution for the principal sum of $36.30, issued from a different justice's court on June 23, 1902. The bank had, during that year, made various loans to Stephenson, and he owed the bank a considerable amount. He was frequently permitted to overdraw his account, temporarily, and sometimes had no money in bank to his

credit. The records of the bank showed that between June 1 and July 18, 1902, twenty-three drafts drawn by various parties upon Stephenson had been returned unpaid. One was for $1,042.93; another for $606.76; four were for $185.42 each, and still another was for $120. The others ranged in amount from $5.70 to $93, and aggregated $924.30. From the 1st to the 18th of July, ten of these drafts were dishonored, while during the corresponding period in 1901 fourteen drafts were returned unpaid. The bank's records did not disclose for what reasons any of the drafts were dishonored, though two of them were returned with the statement that the drawee said he would send check, one with the statement that he said he had sent a check, and another with the explanation that he would write in regard thereto. Another draft, for $47.50, sent to the bank for collection in April, 1902, was by it turned over to an attorney, upon direction from the drawer to do so in the event it was not paid. The cashier of the bank was informed, when the $4,500 note was transferred to the bank, that it was given in part payment of the stock of goods sold by Stephenson, and that he had disposed of them in bulk. He then owed the bank between $7,000 and $9,000, which at that time held a note for $5,600, signed by him and indorsed by his brother, L. L. Stephenson. The cashier knew, before the sale of the stock of goods, that J. J. Stephenson was negotiating with several parties; had "heard in a business way that he was trying to sell out." The reason he assigned for wishing to sell out was that he intended to go to Birmingham and engage in business with his brother. Stephenson and his family lived well while in Elberton; he dressed as neatly as anybody, and owned a horse and buggy, the horse alone costing about $220. He conducted a wholesale grocery store, had a large volume of business, and required a good deal of money in connection therewith. It is not unusual, but customary, for a large number of drafts to be drawn upon one conducting a grocery business of such magnitude.

The two justice's court fi. fas., each for a trivial amount, were not calculated to furnish an index to the financial stability of Stephenson, and would not suggest to even an unusually apprehensive man a doubt as to his solvency. The testimony, viewed as a whole, shows that the dealings of the bank with Stephenson were in due course of business, and that the officers of the bank, acting as reasonably cautious men, had no reason to suspect that he had become in-

volved in debt and would soon have to suspend business, if pressed
by his creditors.   He was apparently successfully conducting a large
mercantile business, in the course of which he was to be expected
to deal with numerous supply houses, not only for cash but on credit.
There seems to have been not even a rumor that he was financially
embarrassed or that he had creditors who were pressing him for
payment.   He made no secret of his purpose to sell out his stock
of goods and remove from the State.   Not until some time after he
had sold. out and transferred one of the purchase-money notes to
the bank did the true state of his affairs come to light.   The only
circumstance from which the officials of the bank could have in-
ferred that Stephenson was not promptly meeting his obligations
was that, during the period between June 1 and July 18, 1902, he
had declined to honor twenty-three drafts drawn upon him and pre-
sented to him for payment by the bank.   It appears that in no in-
stance did he assign as a reason for non-payment that he was with-
out ready funds to meet just demands made upon him.   These
drafts ·did not represent the demands of twenty-three different
creditors, some of them being drawn by the same persons for the
identical amounts for which two or more demands for payment had
been made during that period.   With but few exceptions the drafts
were for inconsiderable amounts ; and the sum total of them was not
out of proportion to the volume of business Stephenson was con-
ducting.   Even a very prudent man, it would seem, could not be
alarmed by the number of drafts returned dishonored, taking into
consideration the amounts for which they were drawn and assum-
ing as a fact that all were just demands against him which he failed
to satisfy when due and which he allowed to remain outstanding
against him up to July 18, 1902.   We are therefore of the opinion
that a jury would not have been justified in finding, as matter of
fact, that the failure to pay these drafts upon presentation was a
circumstance from which the officials of the bank were bound to·
assume, not only that Stephenson was pressed for ready money, but
that, despite all outward appearances of prosperity, he was insol-
vent and had formed an intention to give the bank a preference over
other creditors.   The doctrine of implied notice, relied on by the ·
plaintiff in error, should not be given a harsh and unreasonable
interpretation.   The ends of justice often require its recognition
and a strict adherence thereto.   See, in this connection, *Jordan* v.

*Pollock,* 14 *Ga.* 157-8; *Bryant* v. *Booze,* 55 *Ga.* 438; *Hunt* v. *Dunn,* 74 *Ga.* 120; *Clarke* v. *Ingram,* 107 *Ga.* 570, et seq. But this doctrine can not justly be invoked against one who has neither studiously avoided knowledge of facts which he might readily have ascertained, nor is chargeable with a lack of that ordinary diligence which a reasonably prudent man would observe in making inquiries and keeping himself informed as to matters which may affect his interest. So far as the transfer to the bank of the note for $4,500 is concerned, the plaintiff failed, we think, to show that the transaction amounted to a preference within the meaning of the above-cited section of the bankrupt act.

As to the alleged fraudulent payment by Stephenson to the bank of $1,000, within four months prior to the filing of the petition in bankruptcy on September 20, 1902, the following undisputed facts were brought to light on the trial: Stephenson had purchased from Mrs. Hudson a house and lot in Elberton on credit, and had received from her a bond for title. On February 12, 1901, he transferred this bond for title to the bank as security for his indebtedness to it, and the bank held the bond as collateral security up to September 5, 1902, when Stephenson closed a trade with one Almand whereby Almand was to pay $2,000 for the house and lot, assuming the indebtedness of $1,000 thereon, and allowing Stephenson $1,000 for his equity in the premises. In pursuance of this agreement, Almand, on the date last named, paid to the bank $1,000 and procured from it a transfer of the bond for title. The bank gave Stephenson credit for this payment upon his indebtedness to it. At the time of this transaction the officials of the bank had knowledge of Stephenson's insolvency. The fact last mentioned did not affect the vested right of the bank to realize on the security which it in good faith took from Stephenson in February of the preceding year. In no sense did the original transfer of the bond for title constitute a preference in favor of the bank over other creditors, nor was the payment received by the bank after Stephenson's insolvency became known a fraud upon them. Upon this branch of the case the plaintiff signally failed to show any right to a recovery.

3. The evidence which the court excluded was offered by the plaintiff to establish the insolvency of Stephenson at the time of the alleged preference. With all of it admitted the case would be no stronger; and this being so, we shall not undertake to pass upon its

admissibility. We have dealt with the case upon the assumption that the insolvency of Stephenson at the time of the transfer was shown beyond question; and we uphold the judgment of nonsuit for the sole reason that the plaintiff was unable to go further and show that the bank was chargeable with implied notice of Stephenson's financial condition and of his intention to create a preference in favor of the bank.

4. Exception is taken to the refusal of the court to allow a witness to answer the following hypothetical question: "Where a man is in business and allows drafts after drafts every occasionally to be drawn on him and returned unpaid, giving first one reason, then another; allows himself to be sued for little amounts, and judgments to stand open against him on the record, and does not keep up with his financial affairs; would he or not, in the business world, in your opinion as a business man, or rather, would these facts be sufficient to put a prudent business man on notice or inquiry that something was wrong with the man financially—that he wasn't in the proper financial condition?" The answer was excluded, and properly so, on objection that the plaintiff sought to make the witness draw a bare conclusion from an assumed state of facts. The witness was not competent to express his opinion in regard thereto. In view of the evidence introduced, the effort was really to call on the witness to decide a question of law. Had there been an issue of fact involved, the jurors were the chemists, and the witness could not properly have been allowed to invade their province.

*Judgment affirmed. All the Justices concur.*