## BOOTH *et al. v.* ATLANTA CLEARING-HOUSE ASSOCIATION *et al.*

1. The transaction between the plaintiffs in error and the trustees of the Atlanta Clearing-House Association was in the nature of a loan and the pledge of collaterals to secure the same; and although the amount of the collaterals exceeded the amount of the debt they were intended to secure, no such trust as is prohibited by the Civil Code, § 2695, par. 1, was thereby created.

2. In accepting the certificates from the trustees of the Clearing-House Association, and giving its notes for the amount thereof, and depositing

sufficient collaterals to secure the payment thereof, *no such preference was created as is inhibited by the Civil Code, § 1979.*

3. Under the evidence appearing in the record, the court was authorized to hold that the trustees of the Clearing-House Association were not chargeable with notice of the insolvency of the Neal Bank at the time of the issuance and delivery of the clearing-house certificates.

4. It appearing that the Neal Bank has enjoyed and is still enjoying the benefits derived from the transactions in question, and has not offered to restore the certificates, or any part thereof, neither it nor its creditors are entitled to a rescission of the contract and a restoration of the collaterals to the receiver of the bank, even if for any reason entitled to a rescission.

5. It being not only the right but the duty of one who holds collaterals in the nature of notes and other commercial paper, pledged to secure a debt, to collect the same as they fall due, and to properly apply the proceeds, the court rightly refused to take the collaterals here in controversy from the pledgees and place them in the hands of the receiver, no special reason being shown why it was necessary for the protection of the rights of any one to do so.

Argued July 7, 1908.—Decided February 19, 1909.

Petition for injunction, etc. Before Judge Pendleton. Fulton superior Court. March 9, 1908.

Justice Lumpkin being disqualified, Judge Worrill, of the Pataula circuit, was designated to sit in his stead.

*R. B. Blackburn, E. P. Upshaw, F. M. Hughes,* and *Walter R. Brown,* for plaintiffs.

*John C. Hart,* attorney-general, *Anderson, Felder, Rountree & Wilson, King, Spalding & Little, Westmoreland Brothers,* and *Candlers, Thomson & Hirsch,* for defendants.

WORRILL, J.　1. The record shows, that at different times during a period beginning on the 31st day of October, 1907, and ending on the 30th day of November of the same year, the Neal Bank executed and delivered to the Atlanta Clearing-House Association seven notes or certificates of indebtedness which amounted in the aggregate to $200,000; that the sole consideration for which these notes were given was for certain paper called Atlanta Clearing-House certificates which also aggregated in face value the sum of $200,000; that the Neal Bank, for the purpose of securing these notes, transferred to the Atlanta Clearing-House Association choses in action and other collaterals in the aggregate amount of $295,000; that the amount of certificates obtained at the time of executing each note equaled in face value

the amount of the note given therefor; and that the amount of collaterals put up at each time was approximately·one and one-half times the amount of the face value of the certificates obtained at the time. It further appears that in all of these transactions C. E. Currier, R. J. Lowry, and W. L. Peel, designated as trustees, represented the Atlanta Clearing-House Association. They delivered to the Neal Bank the clearing-house certificates, and received from it its notes or certificates of indebtedness and the collaterals, which they held for the purposes for which they were delivered. It also appears that the sole purpose of the transfers of the collaterals was to secure the notes the bank executed at the time of delivering them, no interest or benefit of any character being reserved in the bank in these collaterals under the contract by which they were transferred, except the right to redeem them upon compliance with the terms of the contract.

The transaction assumed the nature of a loan and the pledge of collaterals to secure the same; and although the amount of the collaterals exceeded· the amount of the debt they were intended to secure, no such trust as is prohibited by the statute was thereby created. See: *Carey* v. *Giles,* 10 *Ga.* 10; *Banks* v. *Clapp,* 12 *Ga.* 514; *Rowland* v. *Coleman,* 45 *Ga.* 204; *Lay* v. *Seago,* 47 *Ga.* 82; *Coulter* v. *Lumpkin,* 88 *Ga.* 277 (14 S. E. 614).

2, 3. Plaintiffs in error contend that the transfers of the collaterals in question by the Neal· Bank to the Atlanta Clearing-House Association violated section 1979 of the Civil Code, which provides that "All conveyances, assignments, transfers of stock, or other contracts made by a bank in contemplation of insolvency, or after insolvency, except for the benefit of all creditors and stockholders, shall be fraudulent and void, unless made to an innocent purchaser for value, without notice or knowledge of the condition of the bank, and the officer making or consenting to such conveyance or contract shall be punished as provided in the Penal Code." In construing the meaning of the provision of the foregoing section of the code, this court, in the case of *Hill* v. *Western and Atlantic Railroad Company,* 86 *Ga.* 284 (12 S. E. .635), held that "Section 4429 [now section 1979] of the code (act of 1833) is a special statute of the State of Georgia with reference to banks, intended to prohibit preferences by a bank insolvent at the time or in contemplation of insolvency, which

preferences might be legal in the case of other insolvent debtors under the act of 1818." This was the interpretation given it in *Hightower* v. *Mustain,* 8 *Ga.* 506, and the same rule of interpretation of its meaning has been followed by the court in later decisions. See *Clarke* v. *Ingram,* 107 *Ga.* 576 (33 S. E. 802); *McGregor* v. *Battle,* 128 *Ga.* 582 (58 S. E. 28, 13 L. R. A. (N. S.) 185). In *Clarke* v. *Ingram,* supra, cited by plaintiffs in error, it will be seen, from an examination of the facts, that the parties to whom the Bank of Americus made the conveyance were its three largest creditors; that a petition had been previously filed against the bank by its creditors, on the ground of insolvency, and under the proceeding a receiver had been appointed by the court to take charge of its affairs; that these creditors who took the deed had previously intervened and been made parties to the petition, thereby adopting all its allegations; that the conveyance embraced practically all the property the bank had; and while a part of its consideration was to secure an advance of money made at the time, it was also made to secure the past indebtedness to the creditors. It further appears that the sole inducement that moved these creditors to make the advance was to get security for the past indebtedness. They had actual knowledge of insolvency; and although a present consideration passed, it was in fact a contract made to procure such a preference as was forbidden by the statute. In this case (page 576 of the volume last cited), in delivering the opinion of the court Justice Lumpkin says this: "This deed was made to secure not only the money advanced but the bank's prior indebtedness to them, and this gave them a preference over other creditors."

This meaning is given to a preference in 10 Cyc. 295: "An unlawful preference can only arise when the transfer is made for an antecedent debt." In the case of Armstrong *v.* Chemical National Bank (U. S. C. C.), 6 L. R. A. 229 (41 Fed. 234), in which the validity of the transfer of certain collaterals by the Fidelity Bank to the Chemical National Bank was attacked as being violative of section 5242 of the U. S. Revised Statutes, which prohibits all transfers by national banking associations after the commission of an act of insolvency, or in contemplation of insolvency, with a view to the preference of one creditor to another, to which statute our own embodied in section 1979 of the Code is analogous, Judge

Wallace, in delivering the opinion of the court, says: "The statute is directed to a preference, not to the giving of security when a debt is created; and if the transaction be free from fraud in fact, and is intended merely to adequately protect a loan made at the time, the creditor can retain the property transferred to secure such loan until the debt is paid, even though the debtor is insolvent, and the creditor has reason at the time to believe that to be the fact. This has often been decided in the analogous cases arising under the bankrupt act." Citing: Tiffany *v.* Lucas 15 Wall. 410 (21 L. ed. 198); Cook *v.* Tullis, 13 Wall. 332 (21 L. ed. 933); Clark *v.* Iselin, 21 Wall. 360 (22 L. ed. 568); Casey *v.* La Société de Credit Mobilier, 2 Woods, 77 (Fed. Cas. 2496).

In Tiffany *v.* Boatman Institutions, 18 Wall. 388 (21 L. ed. 868), the court says: "Neither the terms nor the policy of the bankrupt act are violated, if these collaterals be taken at the time the debt is incurred. His estate is not impaired or diminished in consequence, as he gets a present equivalent for the securities he pledges for the repayment of the money borrowed. Nor in doing this does he prefer one creditor over another, which it is one of the great objects of the bankrupt law to prevent. The preference at which the law is directed can only arise in the case of an antecedent debt." It would seem that the very import of the word "preference" contemplates the relation of existing creditors, having equal or similar rights and equities, at the time of the conveyance or transfer, whereby the rights of one are advanced over those of another in the competition for assets.

The Atlanta Clearing-House Association delivered to the Neal Bank clearing-house certificates at the time of the transfer of the collaterals, and whatever consideration passed was a present consideration. This being true, we do not think a preference was thereby created. Whether the clearing-house certificates which form the consideration of the notes or certificates of indebtedness executed by the Neal Bank to the Atlanta Clearing-House Association constitute a strictly legal consideration or not, the fact that they had value in the locality where they were in circulation and also the further fact that the Neal Bank got full value for the clearing-house certificates it received must be recognized. In the case of Orchard *v.* Hughes, Orchard had given

Hughes his note secured by mortgage, and Orchard set up as a defense to the foreclosure of the mortgage that a portion of the consideration of the note consisted of bills of the Bank of Tekama, Nebraska, that the bank had never been legally chartered by the legislature of that Territory, that these notes were current and in circulation at the time they were received by him and paid out to his creditors, but that the bank soon afterwards failed, and its bills were not redeemed. While the answer alleged that a part of the notes were lost to his creditors, it failed to allege that any of them were lost to Orchard; and the Supreme Court of the United States says: "The fatal defect in both the answer and the proof is, that, admitting every allegation against the legality of the bank charter and of the worthlessness of the paper issued by the bank, Orchard, the maker of the note and of the mortgage, had not been the sufferer. The bills, constituting a portion of the consideration of the note, he used in payment of his debts, while they were current in the community, and he has not taken them back, either voluntarily, assuming that he might have done so, and set up the fact as a defense to the note, nor has he been subjected to the repayment of the debts he discharged by the use of them." Orchard v. Hughes, 1 Wallace, 73, 76 (17 L. ed. 560).

Numerous cases can be found where bonds issued by corporations have been held to be void because the corporation in issuing them acted ultra vires, or in contravention of· law, but in which cases the courts have held that the purchasers of such bonds could sue and recover, from the corporation that issued them, the consideration it received either in money or property. See Louisiana v. Wood, 102 U. S. 294, 298, 299 (26 L. ed. 153); Parkersburg v. Brown, 106 U. S. 487-503 (1 Sup. Ct. 442, 27 L. ed. 328). In the case of Planters Bank of Tennessee v. Union Bank of Louisiana, the Planters Bank had sent the Union Bank Confederate bonds which it sold and credited to the account of the Planters Bank. The Planters Bank brought suit against the Union Bank on the account, and among other defenses made by the Union Bank was that Confederate bonds were an illegal commodity and the transaction was illegal. The court held: "Nor should the court have charged that, in the circumstances of this case, no action would lie for the proceeds of the sales of Confed-

erate bonds which had been sent by the plaintiffs to the defendants for sale, and which had been sold by them, though the proceeds had been carried to the credit of the plaintiffs and made a part of the accounts. It may be that no action would lie against a purchaser of the bonds, or against the defendants on any engagement made by them to sell. Such a contract would have been illegal. But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having value; and when they have been carried to the credit of the plaintiffs, the case is different." Planters Bank *v.* Union Bank, 16 Wall. 483, 499 (21 L. ed. 473).

Under the evidence in the record, the court was authorized to hold that in the transaction between the Neal Bank and the Atlanta Clearing-House Association there is nothing to indicate any fraudulent intent upon the part of either party. The bank at the time needed currency to carry on its business, and the Clearing-House was endeavoring to supply this need by advancing its certificates which proved to be a valuable substitute. But it is perfectly clear that the Atlanta Clearing-House Association was not selling or dealing in clearing-house certificates for the purpose of speculation or with a view of making money, but simply to aid its members in the time of financial distress.

We can not agree with the plaintiffs in error in their contention that the fact that the Atlanta Clearing-House Association and the trustees knew the Neal Bank had guaranteed the whole of the clearing-house certificates issued and that the amount of its guaranty was in excess of all its resources was in itself sufficient to charge them with actual knowledge of the Neal Bank's insolvency. Such liability would at most be contingent; and unless such contingent liability of the Neal Bank as guarantor of the clearing-house certificates, amounting to over one and a half million of dollars, was likely to become absolute, this guaranty by the Neal Bank could not be considered a liability in determining the question of solvency or insolvency at the time of the transfer of the collaterals. *Ayers* v. *Howell,* 111 *Ga.* 864 (36 S. E. 946). No circumstances appear in the record sufficient to suggest a reason for the apprehension of such a contingency upon

the part of either the Atlanta Clearing-House Association or the trustees at the time of the transfer of the collaterals by the Neal Bank, in view of the precautionary regulations adopted by the Clearing-House Association, at the time it ordered the certificates issued, to protect each of the banks to which they were intended to be distributed from liability for each other on their joint guaranty; for the amount and character of the securities required to be put up by each bank as a condition to obtaining from the Clearing-House Association clearing-house certificates rendered it improbable, if not well-nigh impossible, for any one of the banks to become liable as guarantor for more than the amount of the certificates it obtained, much less for the amount of the whole issue. Nor do any other facts appear in the record which, in our opinion, required the judge to hold that the Atlanta Clearing-House Association or the trustees, at the time of the transfer, had actual knowledge that the Neal Bank was insolvent, or in contemplation of ,insolvency. Nor are we prepared to say the circumstances existing at the time were sufficient to charge them with notice of the Neal Bank's insolvency, or that they failed in the exercise of due diligence to ascertain its true financial condition before entering into the transactions. Although the association under its rules may have had the right to enter and examine the bank's financial condition, the failure to do so does not necessarily imply neglect on their part. The position assumed with respect to such failure to examine, in the argument of plaintiff's counsel carried to its ultimate conclusion, would in every transaction of the same nature require absolute certainty on the part of every person before entering into it; and accordingly every transaction made, however fairly or honestly, would be deemed fraudulent and void should it afterwards turn out that the debtor was at the time insolvent.

The law does require, however, that a person having at his command means of information which if pursued would lead to the discovery of the truth should exercise such diligence and make such use of such means of information, according to the circumstances, in finding out the truth, as would be expected to be exercised and used by persons of ordinary prudence under like circumstances.

The Neal Bank was an old institution, having been in the bank-

ing business in the City of Atlanta for many years. While nothing appears in the record to impeach the fairness of its previous financial reputation, the fact that at the time of the transactions in question it was one of the depositories of this State, and the largeness of its deposit account, over two millions of dollars, as shown from its reports to the Atlanta Clearing-House Association, of which the trustees had full knowledge, is sufficient to establish that it was of good financial repute. Besides this, it had been a member of the Atlanta Clearing-House Association for about fifteen years previous to these transactions, and, under the rules of the association, had been making to it weekly reports of its liabilities and resources, which continued up to the date of its failure, all of which reports had showed it to be solvent. Had its embarrassment on account of the shortness of currency, which became known to the association and its trustees, been at an ordinary time, under ordinary conditions, we confess that this fact might have been a circumstance directing suspicion against its solvency. But this condition of embarrassment was not confined to it, but extended to all the other six banks composing the Clearing-House Association, whose insolvency is not under impeachment; and this condition of embarrassment, according to the recitals in the resolutions under which the certificates were issued, as well as the subsequent conduct of the banks in trusting each other, was not attributed to the financial weakness of any member, but solely to the financial panic then on the country, brought about by the temporary suspension of the shipments of currency by the New York banks and those of other cities composing the money centers.

4. No action being brought on the bank's guaranty of these clearing-house certificates, nor on any contract made by the Neal Bank with the Atlanta Clearing-House Association, and no effort being made to enforce any of these contracts directly involving their legal effect, we do not deem it necessary to pass upon their validity. Nor do we deem it necessary, for the purposes of this case, to decide whether or not the Neal Bank, for any of the reasons alleged, violated either section 248 of the Penal Code or any of the provisions of section 1955 of the Civil Code; but conceding, for the purposes of this case, the correctness of the contentions of the plaintiffs in error that the clearing-house certificates

so issued were illegal, and that the contracts made by the Neal Bank with the Atlanta Clearing-House Association, under which it obtained from the bank the transfers of the collaterals in question, were also illegal and contravened the general public policy, would the Neal Bank, while holding on to the clearing-house certificates it had obtained under these contracts, in an action brought by it for the recovery of these collaterals so pledged, be heard in any court, and especially in a court of equity, to assail and set aside its contracts upon such grounds? We think not. No principle of law is better settled than that, as between parties to an illegal contract, neither a court of law nor a court of equity will lend its aid to either party in a suit either to enforce or set aside the contract. And the rule of rescission requires a party to a contract who seeks to rescind it to first restore, or offer to restore, to the other party, whatever property or thing of value he has received under the contract, to the end that the parties may be placed in the condition they were in before the contract was made. Civil Code, §§ 3711, 3712. In the case of *Huff* v. *Mayor and Council of Macon,* 60 *Ga.* 221, involving an illegal contract, this rule was applied. The court held the contract made by the city with the mayor to be illegal and in contravention of public policy; but also held, as a condition to setting it aside, that the city was bound to repay all expenditures made by the defendant upon the faith thereof. This court has held that equity will not, at the instance of the maker, decree cancellation of a deed void for usury, without payment or tender of the principal and lawful interest. *Campbell* v. *Murray,* 62 *Ga.* 87. These rules are founded upon common principles of equity and justice, and will not allow a party, while holding and enjoying the benefits of an illegal contract, at the same time to repudiate its terms.

The question then arises whether its creditors would have any more right to assail and set aside these contracts upon such grounds of illegality than the bank. "As a general rule, a contract which is illegal should not be enforced, nor should relief be granted therefrom in the interest of the creditors of one of the parties thereto any more than in the interest of such party. But if the contract partakes of the nature of an agreement in fraud of the rights of the creditors of one of the parties thereto, relief therefrom may be granted in the interest of the creditors of such

party." 15 Am. & Eng. Enc. Law (2d ed.), 1003-1004, and cita-tions. In 5 Thompson on Corporations, §6030, we find this: "Where a contract of a corporation has been executed by the parties to it, it is not competent for a mere stranger to the con-tract to assail it, and deprive the corporation of the advantage from it, upon the ground that it was interdicted by the charter. And in general it may be said that one whose rights are not injuri-ously affected by reason of the fact that a corporation is acting in excess of its powers, or beyond the warrant of law, has no standing in court to complain of the same." It is a fundamental rule that in order for one party to maintain a cause of action against another, he must show failure of the person complained of to com-ply with some obligation owed him, or the violation of some of his rights by which he has sustained injury.

The acts of debtors with respect to assignments, transfers, conveyances, or other contracts made fraudulently against the rights of creditors, are clearly laid down and defined under the statutes of this State. When an assignment, transfer, or convey-ance is made by a debtor of any of his property in violation of the provisions of these statutes, the law makes the act void, and no injury need be shown by one standing in the relation of a creditor to the party. The principle may be safely stated, that, unless the act complained of be made void with respect to the rights of creditors under the law, before creditors can successfully attack and set aside the transaction they must show that their rights were injuriously affected thereby. We fail to discover wherein the transfers of collaterals made by the Neal Bank to the Atlanta Clearing-House Association were fraudulent against creditors, under the statutes, for any of the reasons urged by the plaintiffs in error. But still assuming as correct the con-tention of plaintiffs in error, that the contracts under which the transfers were made were illegal for the other reasons urged, there is left for determination the question whether the creditors sustained injury by reason of such transactions.

It affirmatively appears from the record that at the time the Neal Bank used and put in circulation the clearing-house certifi-cates which formed the consideration of the notes or certificates given to the Atlanta Clearing-House Association, which notes the collaterals in question were transferred to secure, the clear-

ing-house certificates so used by the Neal Bank had, in the locality in which they circulated, practically the same value as money, being accepted by the banks as money in the settlement of balances between each other, in the payment of drafts and notes and on deposit, and being used generally by the trade in the City of Atlanta and in the territory adjacent thereto. Also, that the Neal Bank got the full benefit of those it received, by using them in carrying on its business and in the payment of its debts. At the time it obtained and used these certificates the Neal Bank was a "going concern," having the legal right to use its assets for all legitimate purposes in the conduct of its business. It was not only morally but legally bound to pay its legitimate debts; and it is to be presumed that the debts and obligations it paid off and discharged with the certificates it used and distributed to the public went in the payment of valid debts of the bank, nothing appearing in the record to show they were used in the payment of any but legitimate debts, or that any misapplication, misappropriation, or other improper use was made of them. By the use of them did the bank not pay off and discharge upwards of one hundred and seventy thousand dollars of its legal debts, and have its liabilities not been decreased that amount? Inasmuch as the bank has paid off its debts, which there is no prospect of its having to pay again, how has the corporation been injured? If by the use of such medium of payment no waste or reduction in the amount of the assets of the bank resulted, how can it be said the creditors were injured? If the certificates used were accepted at the same value as money in settlement of debts by the bank, as appears was the case, of what concern to the creditors is the kind of currency the bank used in discharging these debts, if satisfactory to those who received it?

. To allow the Neal Bank through its creditors to recover back from the trustees the collaterals of which it has had the full benefit in paying off and discharging more than one hundred and seventy thousand dollars of its debts, without taking into consideration this amount of indebtedness from which it has been relieved, would increase the assets of the Neal Bank in that amount, and place it in a far better condition of solvency that at the beginning of the transactions between it and the Atlanta Clearing-House Association. The effect of allowing this done would be to

deprive the parties who took these certificates from the Neal Bank in payment of debts or obligations owed them, or who gave other equivalent therefor, or those who received the certificates from them and stand in their place, of compensation therefor, and at the same time leave their debts and obligations cancelled against the Neal Bank. Such a result from such course of action would be contrary to every conception of equity and common justice. *Butts County* v. *Jackson Banking Co.*, 129 *Ga.* 801 (60 S. E. 149, 15 L. R. A. (N. S.) 567, 121 Am. St. R. 244).

The question to be determined is, not whether the creditors would be benefited by having the collaterals returned to the bank through a receiver, but whether they were injured by the transfers and such use of its collaterals made by the bank. Our conclusion is that no injury has been shown to have resulted therefrom, either to the bank or its creditors, and for that reason the creditors have no more right to attack the transactions upon such alleged grounds of illegality in the contract than the bank would; and that therefore, before they would be entitled under their petition to have a rescission of the contracts and to recover the choses in action and other collaterals pledged by the Neal Bank to the Atlanta Clearing-House Association, they must do equity by returning the certificates, or pay to the trustees the amounts yet due on the notes given by the Neal Bank to the Atlanta Clearing-House Association.

5. It is not only the right but the legal duty of one who holds collaterals in the nature of notes and other commercial paper, pledged him to secure a debt, to collect the same as they fall due and to hold the proceeds until the debt thereby secured becomes due. Nor, in the absence of some special reason arising afterwards, making it necessary to do so for the protection of the rights of the party who pledges them, or the rights of third persons, will a court of equity take collaterals from the possession of the person to whom they are pledged, so long as the debt they are held to secure is unpaid, and place them in the hands of a receiver— not even the excess. We fail to find any reason that makes it necessary to do so in this case.

We have passed upon all the questions made in the record that we deem necessary to decide for the purposes of this case. Upon a consideration of the whole case, we conclude that the court be-

low did not err for any of the reasons assigned in refusing to grant the injunction and to appoint a receiver.

*Judgment affirmed. All the Justices concur, Worrill, J., sitting instead of Lumpkin, J., disqualified.*