## MANGET *v.* CUNNINGHAM *et al.*

1 Where a vendee entered into a contract for the purchase of land by reason of a fraud alleged to have been perpetrated upon him by the vendor's agents who negotiated the sale, the fraud consisting in misrepresentations as to the rental which the property was bringing and the amount of an incumbrance upon it, whereby the vendee was deceived as to its value and was thereby induced to pay a higher price than he would otherwise have paid, and where, after the discovery of the fraud, and with full knowledge of all the facts, the parties to the original contract of purchase entered into a new contract by which the vendee agreed to pay to the vendor for the property three thousand dollars more than the vendor had paid therefor, and the vendee received from the vendor her deed for a consideration amounting to three thousand dollars more than the vendor paid therefor, such consideration being less than the consideration under the initial contract, and in the deed the vendee assumed the payment of outstanding incumbrances upon the property, amounting to $14,500, the vendee is not entitled to recover damages against the vendor, or to have the trade canceled, on account of the fraud perpetrated upon him by the agents of the seller when he entered into the initial contract of purchase.

---

Contracts, 13 C. J. p. 621, n. 63; p. 623, n. 80.

Fraud, 26 C. J. p. 1135, n. 34; 27 C. J. p. 18, n. 33; p. 24, n. 97.

Mortgages, 41 C. J. p. 391, n. 25; p. 758, n. 8.

Trial, 38 Cyc. p. 1565, n. 84.

Vendor and Purchaser, 39 Cyc. p. 1253, n. 99; p. 1279, n. 40; p. 1389, n. 37; p. 1423, n. 41; p. 1428, n. 63; p. 1432, n. 97; p. 1433, n. 8; p. 1997, n. 98, 1; p. 2000, n. 20.

(*a*) In these circumstances it does not concern the vendee whether the consideration of the outstanding incumbrances upon the property was fictitious or not.

(*b*) The evidence did not authorize a finding that any part of the consideration of these incumbrances was fictitious.

2. A contract for the purchase of land may be rescinded at the instance of the party defrauded; but in order to rescind he must promptly, upon discovery of the fraud, restore or offer to restore to the other party whatever he received by virtue of the contract, if it be of any value.

(*a*) If the vendee who claims to be defrauded waits an unreasonably long time to tender back the subject of the contract, the other party may well assume an abandonment of the effort to rescind.

(*b*) Generally one who seeks rescission of a contract on the ground of fraud must restore or offer to restore the consideration therefor, as a condition precedent to bringing the action.

(*c*) Rescission of a contract must go to the whole; there can be no rescission of a contract in part.

(*d*) When a vendee is induced to enter into a contract for the purchase of land by fraud of the vendor, when the vendee discovers the fraud he has an election of remedies. One of such remedies is to rescind the contract, and another is to affirm the contract and sue for damages for the fraud.

(*e*) Where the vendee, after discovery of the alleged fraud and with full knowledge of all the facts, instituted a proceeding to recover damages which he alleged he sustained by reason of this fraud, and sought to have these damages set off against the amount of purchase-money due by him on the land, and to have cancelled as clouds upon his title, and to the extent of the damages so sustained, deeds to the property, securing loans which he had assumed as part of the purchase-money, he can not afterwards have canceled the contract of purchase and the deeds executed to carry it out.

3. Where a purchaser of land agrees, as a part of the purchase-price to be paid, to discharge an existing mortgage on the property, in the absence of fraud he will not be heard to deny the validity or amount of the mortgage debt.

4. The court did not err in overruling the demurrer of the plaintiff to the intervention of the receiver.

5. The grounds of the motion for new trial show no cause for reversal, and are not of such character as require discussion.

6. Under the pleadings and the evidence a verdict was demanded in favor of the intervenors against the plaintiff, and the court did not err in directing the jury to return that verdict.

No. 6039. FEBRUARY 27, 1928.

Equitable petition. Before Judge Howard. Fulton superior court. May 2, 1927.

The petition of John A. Manget against R. B. Cunningham, filed on May 30, 1925, alleged that on March 10, 1923, petitioner bought two tracts of land in the City of Atlanta from Mrs. Pearl

Treadwell for the sum of $18,000, a part of which purchase-price was assumption by petitioner of two loans against said property totaling $14,500; that whereas the loan deeds recited the loans to have been $14,500, they totaled in fact the sum of half that amount, or $7250, as petitioner afterwards learned; that petitioner has paid defendant $1015 interest on said loans; that Mrs. Treadwell and her agents induced petitioner to buy the property by falsely representing its value, representing in fact that a loan had been extended upon it in twice the actual sum loaned; that any sum petitioner might pay defendant above $7250 and interest on said loan deeds would belong to Mrs. Treadwell; that the defendant is threatening suit against Mrs. Treadwell to foreclose the loan deeds in the sum of $14,500 with interest, because of an alleged default in payment of interest, whereas he is not entitled to foreclose for any sum greater than he actually loaned; that petitioner offered, on May 26, 1925, to pay defendant $7250 with $126.88 interest, but defendant refused to accept the tender or to cancel the loan deeds; that petitioner still offers said tender to be made into court, subject to cancellation of the loan deeds and cessation of interest as of the above date of tender; and that equity is petitioner's only remedy. He prays that the defendant be enjoined from foreclosing the loan deeds for any greater amount than $7250 principal and $126.88 interest; that defendant be required to accept said tender and satisfy said deeds so far as defendant is concerned, and deliver them to petitioner; that said loan deeds be canceled of record as a cloud upon petitioner's title; and for general relief. Copies of the conveyances involved were attached to the petition. The defendant answered on July 23, 1925, denying that the actual loan was half what was represented, and all allegations of fraud and misrepresentation and the various claims to equitable relief. Mrs. Treadwell intervened on September 18, 1925, setting up that she was the widow of B. H. Treadwell, after whose death there was set apart to her as a year's support the sum of $7500 out of his estate; that her husband's estate was insolvent, a receiver had been appointed, but there was no money in his hands to pay said year's support, which remained as a claim of highest priority; that petitioner bought the lands and assumed the loans set up by him, but Cunningham had an interest in only half the face of said loans, the other half being the property of her husband during his life,

and after his death the property of his estate which became insolvent; that on March 16, 1923, Cunningham executed and delivered to her husband, then living, a quitclaim deed to half of said loans and said lands, which was recorded on May 28, 1925. She prayed to have said loan deeds foreclosed and half the proceeds paid to the defendant and the other half to intervenor on her year's support, and further that, if half of said proceeds did not make half the face of the loans, she have judgment against plaintiff for enough to make half the face of the loans.

Cunningham on June 12, 1926, filed a cross-action against Manget and Mrs. Treadwell, setting up that the estate of B. H. Treadwell owned an undivided half interest in said loans, the loan deeds for which were signed by Mrs. Treadwell; that notes were given by Mrs. Treadwell, one for $12,500 and another for $2000, corresponding to the two loan deeds which secured them, and that attached to each note were interest coupon notes signed by her as maker, and all payable to Cunningham; that said notes matured February 26, 1926, and were therefore past due; that on March 16, 1923, Cunningham by quitclaim deed conveyed to B. H. Treadwell an undivided half interest in said notes and loan deeds; and that Cunningham owned a half interest in said loan deeds and either the estate of B. H. Treadwell or Mrs. Treadwell owned the other half. He prayed for a judgment against Mrs. Treadwell as maker, and Manget on his assumption, in the sum of $14,500 principal, with interest and costs. Charles B. Shelton, as receiver of the estate of B. H. Treadwell, intervened on June 15, 1926, alleging that he and Cunningham had notified Mrs. Treadwell and Manget of their intention to sue them on said notes for principal, interest, and attorney's fees; and that he filed said intervention and cross-action for the reason that the case was in equity, and to avoid a multiplicity of suits. He prayed to be made a party; that he be allowed to foreclose the two loans; that he have judgment against Mrs. Treadwell and Manget for $14,500, with interest and 10 per cent. attorney's fees and costs; and that an undivided half interest in said judgment be declared a special lien upon said real estate. Mrs. Treadwell, on July 3, 1926, answered this intervention, denying the right of the receiver to any attorney's fees; and setting up that Cunningham had sued separately, and that she was entitled to a personal judgment against Manget for

the full amount of her year's support and full collection thereof, before any amount went to said receiver, and that in no case could any judgment lie against her in any amount. On July 15, 1926, Manget demurred to the receiver's intervention, on the grounds that there was no agreement to pay any attorney's fees, that the receiver failed to allege there was no administration upon the estate, or any other fact that would entitle him to sue upon a chose in action belonging to said estate, and that the receiver's allegations did not show him entitled to intervene. Manget also answered the receiver's intervention and set up that the conveyances asserted by the receiver, executed by Mrs. Treadwell, were without legal consideration save to the extent of half their face; that Mrs. Treadwell at the time she executed said papers to Cunningham received only half the sum recited, the other half being fictitious and made to deceive plaintiff as to the property's true value, and did deceive him to the extent of causing him to pay $7250 more than the property was worth; that B. H. Treadwell was the husband and agent of Mrs. Treadwell in the transaction, was a party to and knew of said fraud; that the making of said loan deeds to Cunningham to secure twice the amount loaned and the transferring of same by Cunningham to B. H. Treadwell was a scheme to evade the law requiring superior court sanction to a transfer of property by a wife to her husband; that the conveyance from Cunningham to Treadwell was void because without consideration, and passed no title because Cunningham had none, due to having been made to secure a fictitious debt, and was a part of a fraudulent transaction between Cunningham, Treadwell, and Mrs. Treadwell, by which Manget had been induced to pay $7250 more for said property than it was worth. He prayed to be allowed to pay Cunningham $7250, and that he have an accounting with Mrs. Treadwell for the money paid her as part of the purchase-price and the net amount he had received as rents, and that the trade between them be rescinded and canceled. The court overruled Manget's demurrer to the intervention of the receiver, save as to the challenge of the right to attorney's fees, which part was sustained. Manget excepted to this judgment. On February 8, 1927, Manget answered the intervention of Mrs. Treadwell, setting up that her agents induced him to buy said property by representing to him that Cunningham would never loan more than forty or fifty per

cent. of the value of property, being familiar with real estate values, and by reason of this representation of Mrs. Treadwell's agents he was defrauded, when in fact only half the sum claimed was loaned; that he agreed to pay Mrs. Treadwell $3500 above the amount of the loans, which he had paid, and that before the discovery of the fraud he had paid also $1015 interest. He prayed for rescission and return of this money with interest thereon, or in lieu of rescission that he be allowed to pay Cunningham the $7250, and that the security deeds be canceled.

On the trial Manget testified as follows: I got the deed to this property from Mrs. Pearl Treadwell on March 10, 1923. I first bought it in January, 1923. In negotiating for the purchase of this property I dealt with J. W. Harris and John Oglesby. Did not negotiate at any time with Mrs. Treadwell with reference to its purchase. Oglesby and Harris were real-estate agents. At the time I was negotiating for the purchase of this property with them I did not know anything about it. They told me there was a first-mortgage loan on it of $14,500. I do not recall whether they told me who was making the loan, or who had made the loan. They told me it rented for $300 a month. I investigated and found out it was not renting for that price. I was induced to buy this property by the representation of these agents that there was a bona fide first mortgage loan of $14,500 on it, and that it was renting for $300 per month. Did not question the mortgage at first, but did check up to see what it was rented for. It was said to be rented for $150 per month. At first I told these agents I would agree to pay them $23,500 for this property, because, first, there was a bona fide first-mortgage loan of $14,500 on it; and second, because it was rented for $300 per month. Found out that it was rented for a price considerably less than $300 per month, and told them I would not take the property after I had checked it up. Cunningham's connection with this loan was mentioned by these agents before the trade was closed. After I found out there was not a $14,500 mortgage on it, and after I checked the rent and found out the property was not renting for $300 per month, and after I found out there was only a mortgage of $6000 on the property, I refused to go on with the trade. Finally took that up with Mr. Cunningham. At first negotiated with the two real-estate agents who stated the property had a first-mortgage loan

of $14,500 on it. They told me that Cunningham was going to make the first-mortgage loan on it, or had made it; and I would not have gone on with the trade if Mr. Cunningham or some one else of equal ability had not made the loan. The only condition that I would have purchased the property was the fact that there was, as they stated, a $14,500 first mortgage on it, and that it rented for $300. Gave $300 monthly notes for the difference that I was to pay over the bona fide first-mortgage loan of $14,-500.00. Paid these notes, but when I found out the property was rented for so much less than it was stated, I would not go on without their crediting these notes $100 a month to make up the difference. I paid $200 on these notes. I put a second mortgage on the property to secure a loan. I paid the first interest coupons for $437.50 on the $14,500 loan, and those for $70. At the time I paid these interest coupons I did not know that Mr. Cunningham had not made the loan for $14,500 on this property. Did not know that until after two years. Have not paid any interest or money since. I don't recall having any conversation with Mrs. Treadwell with reference to this property, except one 'phone message. I think the market value of this property at the time I purchased it was between ten thousand and twelve thousand dollars. A short time after I bought it I offered it for $14,500, and received no bidders.

Cross-examination: I do not know of my own knowledge how much money was loaned on that property. I know Mr. Cunningham made the loan on the property of $7250. Whether the rest of it was actually loaned by Mr. Treadwell or some one else I do not know. I know that they held a loan for $6000.00, which had been reduced some. Witness identified his signature to letters hereafter set out, and testified that the notations upon these letters were made and signed by him; also his signature to a letter dated January 5, 1925, in which he wrote: "I believe that the property is easily worth today $250 a front foot, even though I might have paid a little more for it when I bought it at $200 a foot several years ago. Since that time the Biltmore Hotel development has all taken place. The splendid house adjoining this property has been built, and the street has had a nice pavement placed on it. . . In view of all these very valuable additions to the property it seems that it should sell. Owing to the fact that I am so hard

pressed for funds I will sacrifice it and stand the loss of the interest and taxes and insurance and sell it at $200 a foot." He testified that the lot had a frontage of ninety feet. He admitted writing the letters of August 26, 1924, and March 8, 1923; to B. H. Treadwell, hereafter set out, and testified: Did not know at the time I wrote the above letters that Mr. Cunningham had not loaned $14,500 on that property. Do not know how much money was loaned on the property.

R. B. Cunningham testified: Treadwell handled the actual transaction, and was supposed to have put up as much as I did; I don't know whether he paid out a single cent; he was to put up half and I was to pay half. The loan deeds to Cunningham and his quitclaim deed for half the loan sum were executed simultaneously. Treadwell wanted something to show for the money he put into it. Half the interest Manget paid went to Treadwell and half to me (Cunningham). Treadwell did not pay me any·thing for half interest in the loans.

Mrs. Treadwell testified: She signed the loan deeds and notes to Cunningham, but no consideration passed to her therefor. She did not owe her husband any money at the time; he was handling certain matters for her; she did not handle any of the transaction. Mr. Manget called me and asked if I knew anything about it, and I told him I knew absolutely nothing. I did not authorize any one to borrow from Cunningham $14,500 or any other amount for me and in my behalf. I did not know that they were negotiating a loan from Mr. Cunningham to me. There was no consideration moving me to execute these two deeds. I signed the deed to Manget and deeds and notes to Cunningham, without making any inquiry of my husband as to their import. As to the quitclaim deed from Cunningham to my husband, my husband had it at the house, asked me to put it away; and after he died I had it as temporary administratrix and turned it over to the receiver.

E. R. Craighead testified: As attorney for John A. Manget I went to see Mr. Cunningham about these loans purporting to have been made by him to Mrs. Treadwell and assumed by Mr. Manget. Manget stated he was unable to pay the interest coupons due Cunningham; that the loan was about due and he could not go any further with it. Willis Everett, an attorney, represented Cunningham, and demanded payment of the interest coupons;

was about to declare the loan due for the reason that the interest was in default. Manget said that he had made up his mind to get out from under the proposition. He said I could have the property for what was against it. I then went over to see Mr. Cunningham and told him that I was representing Manget, and that Manget had made me that proposition. I asked Mr. Cunningham if he would renew his loan on payment of the interest. Mr. Cunningham stated that he wanted out of the property the amount of the loan he had put into it, $7250. I arranged with my bank to get this amount to pay Mr. Cunningham. When I went back to him he referred me to his attorney, Mr. Spalding. Mr. Spalding said that he could not accept $7250; that if Cunningham took my money he thought I would have to pay Mrs. Treadwell. I was there to pay Mr. Spalding off if he would cancel the loan deeds, but he wouldn't take the money.

Shelton, the receiver, testified that the estate of Treadwell was insolvent. Manget, recalled, testified: I executed a second mortgage on this piece of property for $4000 in favor of a cousin of mine. Did not get any money from him on the strength of that. I had been owing him money, and gave him this as additional collateral for the money I owed him. This mortgage was given one or two years after I bought the property. But I owed him before I found out about this mortgage. My mortgage to him embraced other property.

J. G. Oglesby Jr. testified: My name appears in these papers. Don't remember the exact details when the Upchurch property was sold to Mrs. Treadwell, and later on sold to Manget. Was present at the negotiations which led up to that sale. My recollection is that Mr. Treadwell furnished the money. Don't remember how much he furnished, but it was about $13,500 or $14,000. Mr. Upchurch got $13,000 and a piece of property on Allene avenue. Mr. Harris was the man who was looking after the sale of this property. The reasonable market value of this property at the time Mr. Manget bought was about eighteen or twenty thousand dollars.— Cross-examination: Did not say anything about the loan, except I understood Mr. Treadwell was going to furnish the money. He asked me what I understood about it. I told him that Upchurch told me there was a loan of about $7500 on it. Upchurch was to pay the loans out of the money he received. Was not the agent

for Mrs. Treadwell when making this trade with Manget. Was helping Harris. Never saw Manget or talked to him about it. I was representing the Treadwells through Harris, and in that way represented them. I signed that contract for the owner.

Plaintiff introduced the following evidence: (1) Contract dated January 19, 1923, for sale and purchase of the property in controversy, signed by John A. Manget as purchaser, and J. G. Oglesby for the owner, Mrs. Pearl Treadwell, the purchase-price to be $21,-500, to be paid by $2000 cash, assuming loan of $14,500, and giving 25 monthly notes of $200 each, bearing six per cent. interest. (2) Twelve promissory notes made by Manget to Mrs. Treadwell, dated March 10, 1923, which had been paid off, and which covered the $3500 referred to in the deed; also four interest-coupon notes totaling $1050, made by Mrs. Treadwell to Cunningham, which were paid by Manget as part of the consideration for said property. (3) Deed dated February 26, 1923, conveying the property in controversy, by Mrs. Treadwell to Cunningham, to secure a note for $12,500; and of same date, deed from Mrs. Treadwell to Cunningham, to secure a note for $2000. Each of these deeds covered separate parts of the land in controversy. (4) Note, with three interest-coupon notes attached, dated February 26, 1923, by Mrs. Treadwell to Cunningham, for $2000; also note by Mrs. Treadwell to Cunningham, for $12,500, dated February 26, 1923, with three interest-coupon notes attached. (5) Certificate of deposit for $800, issued by Atlanta National Bank to Cunningham; cashier's check by said bank, dated February 26, 1923, payable to A. C. Hull, Cashier, Equitable Life Assurance Society, for $4879.86; and check on said bank by Cunningham to B. H. Treadwell, for $1350.70, dated April 1, 1923; these items having been identified by Cunningham as representing the $7250 that he advanced as the consideration of the two security deeds given him by Mrs. Treadwell on February 26, 1923. (6) Quitclaim deed from Cunningham to B. H. Treadwell, dated March 16, 1923, recorded May 18, 1925, conveying a half undivided interest in the two security deeds made by Mrs. Treadwell to Cunningham on February 26, 1923. (7) Warranty deed made by Mrs. Treadwell to Manget, conveying the property in dispute, dated March 10, 1923, reciting a consideration of $18,000, to be paid by assumption of the $14,-500 debt held by Cunningham, and $3500 in twelve notes.

Evidence introduced by intervenor: (1) Warranty deed from Upchurch to Mrs. Treadwell, conveying the property in dispute, dated February 7, 1923, reciting a consideration of $15,000, and made subject to two loans, one for a balance of $4893.74 and one for $1000. (2) Loan deed from Upchurch to the Equitable Life Assurance Society, dated June 1, 1920, covering a part of the property in dispute, to secure a loan of $6000; marked satisfied March 10, 1923. (3) Deed from Upchurch to S. T. Woods, dated March 19, 1921, conveying a part of the property to secure a loan of $1000; marked satisfied March 5, 1923. (4) Deed by John A. Manget to S. H. Manget, dated September 18, 1923, conveying the property in dispute, and made to secure a loan of $4400, due September 18, 1925. (5) Abstract of title to this property made by the attorney for Manget. (6) Letter from Manget to B. H. Treadwell, dated August 26, 1924, acknowledging receipt of a letter from Treadwell to him in regard to the interest payable on the loans on this property due that day, stating that the writer owed Treadwell a note for $200 due that day, which Treadwell had been good enough to carry for him, and adding: "I am where I can not possibly make these payments to-day, and I am writing to ask if you can think of some way to help me carry this for ninety days. I am willing to pay 5% commission and 8% interest, putting up the real-estate coupons as collateral, which are a first lien on the property. . . If you can help me sell the property even at a loss, please list it on your books and help me to move it. It should be worth, in view of the splendid improvements adjoining it and the Biltmore Hotel, at least five thousand dollars more than it was when I bought it." (7) Letter dated March 8, 1923, from J. G. Oglesby to J. W. Harris: "In behalf of the owners of 39 East 6th Street, I am willing to accept proposition as outlined by Mr. Manget, with the following minor change. As it is far preferable to have a 'tenant at will' instead of having the property tied up on a long lease, have the monthly notes credited with $100 each. Also, it would be only fair that Mr. Manget receive some profit from any sum that would be realized above the $18,000; therefore there should be a stipulation that he is to receive a profit of at least $700, which would be 20% on his $3500 invested." Following Oglesby's signature: "As above, please. Manget." (8) Letter dated March 8, 1923, from Manget to Harris: "In

further reference to the unfortunate deal that we have had up for some time, I wish to again reiterate my oft-repeated statement to you that I have never felt that you misled me intentionally in regard to this matter; neither do I judge that any one else wilfully misled you; at the same time, I was seriously misled, and my agreement to purchase the Sixth Street property was based on the information that you brought me, namely, that there was a first mortgage of $14,500. After I found out that the first mortgage was only $6000, I turned the deal down, and when Mr. Oglesby came to see me with you I told you then that I would not split hairs on the information that there was a mortgage of $14,500 on the property; and I told you and Mr. Oglesby that I would yet take the property, provided there was a bona fide mortgage on the property, based on the value of the property, for that sum. I have found out that the mortgage that is proposed to be placed is not such a mortgage, and I feel again entirely relieved by any obligation whatever. The records show that, two or three weeks after I agreed as above, a deed was recorded in favor of Mrs. Treadwell, and the consideration was fifteen thousand dollars. I do not want the property, and I hope your client will not agree to it; but rather than have a lawsuit I will pay three thousand dollars more than the party paid who bought it since I made the agreement with you. I will also give you a twelve-months contract that if the property is sold above this sum I will allow whatever amount it brings above the price I paid to be applied to making up the price I originally agreed to pay, namely $20,750, based on the information as outlined above, which I have found not to be correct. For this difference I will give you twelve monthly notes of three hundred dollars each; you to collect the rent and credit on three notes the amount agreed upon as rental for the property." Following the signature: "Mr. Craighead, Please make settlement in accordance with above and Oglesby's letter attached. Jno. A. Manget."

(9) Proposal dated March —, 1923, from Oglesby, for the owner, to Manget, reciting that Oglesby, for the owner, had sold to Manget the property involved in this case, for the consideration of $20,750; that some misunderstanding had come about in regard to the terms and conditions of the sale, and that as an adjustment of these differences the purchase-price for the property should be reduced to $18,000, to be paid by the assumption of first-mortgage

loans amounting to $14,500, and the giving of eleven notes for $300 each and one note for $200, payable monthly, with six per cent. interest; and for a period of twelve months from date, in the event of the sale of the property within that time, any sum derived from its sale in excess of eighteen thousand dollars should be divided, $700 to Manget, and the remainder up to $2750 should be paid to Oglesby for the owner. (10) A letter from Manget to Treadwell, the contents of which are given in Manget's testimony as set out above.

The court directed a verdict in favor of Cunningham against Mrs. Treadwell as maker and Manget on his assumption for $12,-500 principal, and interest amounting to $2420.14, similarly for $2000, with $388 interest; that Cunningham was entitled to a general judgment against Manget for said amounts, and a special lien on the real estate to secure the same; that Mrs. Treadwell's year's support was legal and to be paid, according to law of priority, out of Treadwell's undivided half interest in the loans, found to be good, all sums that could be made therefrom; that her claims were ahead of the receiver's; and that neither Cunningham nor the receiver was entitled to any judgment against Mrs. Treadwell. Manget filed a motion for new trial on the general grounds. By special grounds he contended that the court erred in directing the verdict, because the issue of rescission was made but not presented to the jury by the court; because whether Manget paid $7,250 more for the property than it was worth was a question of fact; because the amount directed for Cunningham was $14,500 and interest, whereas the pleadings and contentions would make no more than half that sum; and because the verdict was in favor of contentions which movant had shown grew out of fraud. Also, that the court erred in entering up a decree based on said verdict, which was unauthorized, and embraced matters not in issue between Mrs. Treadwell and the receiver, who were codefendants; and that the court erred in refusing to admit certain testimony offered by plaintiff, and in admitting certain documents offered by the other side. The motion was overruled, and Manget excepted.

*Levi O'Steen, W. C. Henson,* and *Craighead & Craighead,* for plaintiff.

*Spalding, MacDougald & Sibley, Slaton & Hopkins,* and *McElreath & Scott,* for defendants.

HINES, J. (After stating the foregoing facts.)

1. Conceding that the agents who represented Mrs. Treadwell in the sale of this property perpetrated a fraud upon Manget by representing that the property was bringing in a monthly rental of $300 and that there was outstanding on the property a first mortgage of $14,500, which representations were made to induce Manget to enter into the contract to purchase, made in January, 1923, and which did induce him to enter into said contract by which he agreed to pay for said property $21,500, to be paid by the assumption of an incumbrance of $14,500 on the property, $2000 in cash, and to give twenty-five notes for $200 each; and conceding further that this fraud authorized Manget to refuse to carry out the terms of the contract made in January, 1923, we do not think that he was induced to enter into the final contract of purchase by reason of any fraud, or that he was entitled for any reason to recover damages for the fraud or to have the contract rescinded. The contract made in January, 1923, was mutually abandoned by the parties. After its abandonment they entered into a new contract. The evidence does not authorize a finding that Manget was induced to enter into this contract by reason of fraud perpetrated upon him by the agents who represented Mrs. Treadwell in the negotiations which led up to the final agreement under which Manget purchased this property. On March 10, 1923, when Mrs. Treadwell conveyed this property to Manget for a reduced consideration of $18,000, the evidence demands a finding that no fraud was perpetrated by these agents on Manget when he closed the final deal. At that time he knew that the previous representation of these agents that this property was bringing in a monthly rental of $300 was not true. At that time he was not deceived by the previous misrepresentation of the agents of the seller that there was a first mortgage of $14,500 on this property. On March 8, 1923, Manget wrote to J. W. Harris, one of the agents of the seller, that he wished to again reiterate his oft-repeated statement to Harris that he had never felt that Harris misled him intentionally in regard to these matters, and that he did not then judge that any one else willfully misled Harris, but at the same time that he was seriously misled, and his agreement of January, 1923, to purchase this property was based on the information brought to him by Harris that there was a first mortgage of $14,500 on

this property. He then states that after he found out the first mortgage was for only $6000 he turned the deal down, and that when Oglesby, the other agent, came to see him with Harris he told them then he would not split hairs on the information that there was a mortgage of $14,500 on the property, and that he then told these agents that he would yet take the property, provided there was a bona fide mortgage on the property, based on the value of the property, for that sum.

If nothing further appeared, it might be well said that Manget agreed to still take this property, provided there was a bona fide mortgage upon it, based on its value, for that sum. But in this letter he goes on to say: "I have found out that the mortgage that is proposed to be placed is not such a mortgage, and I feel again entirely relieved of any obligation whatever. The records show that, two or three weeks after I agreed as above, a deed was recorded in favor of Mrs. Treadwell, and the consideration was $15,000." After thus finding out that Mrs. Treadwell had paid $15,000 for this property, in this letter he further wrote: "Rather than have a lawsuit I will pay $3000 more than the party paid who bought it since I made the agreement with you. I will also give you a twelve months contract that if the property is sold above this sum I will allow whatever amount it brings above the price I paid to be applied to making up the price I originally agreed to pay, namely, $20,750.00, based on the information as outlined above, which I have found not to be correct. For this difference I will give you twelve monthly notes of three hundred dollars each; you to collect the rent and credit on these notes the amount agreed upon as rental for the property." At this time Manget knew that a mortgage for $14,500 did not exist on the property. He further knew that the mortgage that was proposed to be placed upon the property was not a bona fide mortgage for said sum. With this knowledge he agreed, upon having learned that Mrs. Treadwell had paid for this property $15,000, to pay her $3000 more than she had paid for it. In pursuance of this new agreement she executed and delivered to Manget her deed to this property for a consideration of $18,000; and in this deed Manget assumed a loan of $14,500. So it clearly appears that in closing this deal and in accepting this deed Manget did not rely upon the previous representations of the agents of Mrs. Treadwell that

there was a first-mortgage loan of $14,500 on this property, and that it was bringing in a monthly rental of $300. He was then acting upon information that Mrs. Treadwell had paid $15,000 for this property, and on this information he made his offer to buy it for a consideration of $18,000. The deed from Upchurch to Mrs. Treadwell recited a consideration of $15,000. It was made subject to two loans, one for a balance of $4893.74, and one for $1000. It was dated February 7, 1923, and was duly recorded.

There is nothing in the evidence to indicate that Mrs. Treadwell did not pay Upchurch $15,000 for this property. On the contrary the evidence discloses that she paid that sum for it. In his letter to Harris, Manget wrote that the record showed that, two or three weeks after he had agreed to buy this property in January, 1923, a deed was recorded in favor of Mrs. Treadwell and that the consideration of this deed was $15,000. It was upon this information that Manget offered to pay Mrs. Treadwell $3000 more than she gave for it. He was not then relying upon any statement of her agents that there was an incumbrance amounting to $14,500 on this property. Furthermore, in his letter he states that the mortgage which they proposed to put upon the property was not a bona fide mortgage for $14,500. With full knowledge of the true facts, and not relying upon any representation made by the agents of Mrs. Treadwell as to the incumbrance upon the property, but relying upon the fact that she had paid $15,000 for it, he expressed his willingness to pay her $3000 more than she had paid for it; and in accordance with this offer she executed to him her deed for a consideration of $18,000, subject to two loans aggregating $14,500. Furthermore, the evidence demands a finding against the contention of Manget that these loans were fictitious and did not represent any money advanced by the husband of Mrs. Treadwell when she purchased this property from Upchurch. There is no evidence authorizing a finding that the husband did not advance for his wife $7250 on the purchase of this property. On the contrary the evidence shows that the money paid to Upchurch was paid by the husband, and that most of the money advanced to the wife by Cunningham was used in discharging the incumbrances on the property at the time she purchased it from Upchurch, and which she assumed and agreed to pay. In these circumstances the vendee was not entitled to recover any damages for the fraud al-

leged to have been perpetrated upon him in originally entering into the contract of purchase, and to have such damages set off against the purchase-money which he agreed to pay for this property; nor was he entitled to a rescission of the trade. In this situation it does not concern him whether the incumbrances which he assumed were without consideration.

2. The pleadings of Manget do not make a case for rescission of the trade between him and Mrs. Treadwell. It is indisputable that he knew, on May 30, 1925, of the alleged fraud on account of which he seeks rescission of the trade and cancellation of the instruments made to carry it into effect. On that date he instituted the present action, and in his petition set out this fraud. So beyond doubt he knew all about this fraud at that date. Yet he took no steps to rescind the trade and to cancel these instruments until July 15, 1926, when he filed his answer to the intervention of the receiver of the estate of B. H. Treadwell. So he first took steps to secure the rescission of this trade and the cancellation of these instruments after the lapse of more than one year after he had full knowledge of the fraud upon which he seeks the rescission and cancellation. ' A contract may be rescinded at the instance of the party defrauded; but in order to rescind he must promptly, upon discovery of the fraud, restore or offer to restore to the other whatever he has received by virtue of the contract, if it be of any value. Civil Code, § 4305. The party seeking rescission must proceed with his offer to restore what he has received, with that promptitude which the nature of the case and environment of the circumstances would require, as manifesting an intention to treat, from the discovery of the fraud, what he has received as the property of the other party. If he waits an unreasonably long time to tender back the subject of the contract, the other party may well assume an abandonment of the effort to rescind. *Jordy* v. *Dunlevie,* 139 *Ga.* 325, 330 (77 S. E. 162). Ordinarily he who knowingly accepts and retains any benefit under a contract which he has been induced to make by fraud, after he has knowledge of such fraud, affirms the validity of the contract and will not be heard thereafter to repudiate it under this section. *Legg* v. *Hood,* 154 *Ga.* 28 (113 S. E. 642). Rescission of the contract must go to the whole. There can be no rescission of a contract in part. *Baker* v. *Corbin,* 148 *Ga.* 267, 270 (96 S.

E. 428). The restoration must place the parties in the status they were in prior to the contract. *Booth* v. *Atlanta Clearing-House Association,* 132 *Ga.* 100 (63 S. E. 907).

When a vendee is induced to enter into a contract for the purchase of land by the fraud of the vendor, when the former discovers the fraud he has an election of remedies. One of such remedies is to rescind the contract, and another is to affirm the contract and sue for damages for the fraud. *Hunt* v. *Hardwick,* 68 *Ga.* 100; *Wright* v. *Zeigler,* 70 *Ga.* 501; *Bacon* v. *Moody,* 117 *Ga.* 207 (43 S. E. 482); *Tuttle* v. *Stovall,* 134 *Ga.* 325, 328 (67 S. E. 806, 20 Ann. Cas. 168); *Joiner* v. *Southern Land Sales Cor.,* 158 *Ga.* 752 (2) (124 S. E. 518). One who seeks rescission of a contract on the ground of fraud must restore or offer to restore the consideration therefor as a condition precedent to bringing the action. *Williams* v. *Fouché,* 157 *Ga.* 227 (121 S. E. 217). After discovery of the alleged fraud and with full knowledge of all the facts, Manget instituted the present proceeding for the recovery of damages which he claimed he sustained, and sought to have these damages set off against the amount of purchase-money due by him on this land, and to have canceled, as clouds upon his title, the deeds on this property, securing loans which he had assumed as a part of the purchase-money, to the extent of the damages so sustained. He thus claimed some benefit under his purchase, and sought cancellation only pro tanto. This he could not do. Furthermore, in none of his pleadings did he allege that he had restored or offered to restore the land to his vendor in the condition in which it was when he bought it, prior to the institution of his proceedings to have the same cancelled. He elected in the beginning a remedy which was inconsistent with the rescission and cancellation of the trade in toto. By this course he affirmed the trade. For all of these reasons he was not authorized to seek a rescission of the trade and the cancellation of the instruments made to carry it out in its and their entirety. So we are of the opinion that the court did not err in refusing to cancel this trade and these instruments.

*Judgment affirmed. All the Justices concur.*

GILBERT, J. I concur in the judgment of affirmance solely because the petitioner did not promptly, on discovery of the fraud, begin suit for rescission. I am of the opinion that the facts of the

case were such that the court would have been required to submit that issue to the jury, but for delay. It is true that the petitioner brought suit against one of the defendants within about a month from his discovery of the misrepresentations, but he did not proceed against his grantor for rescission until the lapse of nearly two years.